Order accordingly.

------

GEORGE WINTERMUTE and JOSEPH R. WINTERMUTE, Ex'rs of PETER WINTERMUTE, deceased, v. WILLIAM SNYDER and ANDREW LITTLE, Surviving Ex'rs of JOHN SNYDER, deceased, and GEORGE SNYDER and others, the children and heirs at law of WILLIAM SNYDER, deceased.

A testator by his will gave and bequeathed to his wife his real estate, and so much of his personal as she might choose to take, to be held and enjoyed by her during her natural life. He then ordered, that after the death of his wife, his personal and real property should be sold and divided, two thirds to his own relations, and one third to his wife's relations; "that is to say, the two thirds shall be divided, share and share alike, between the heirs of J. S., W. S. and his heirs, and P. S. and his heirs; and the one third shall be divided between A. M. and his heirs, and M. the wife of J. M. and her heirs." The division was ordered to be made by his executors within a reasonable time after his wife's death, not to exceed three years. *Held,*

1. That the legacies over after the death of the testator's wife, vested on the death of the testator.
2. That the heirs of J. S. (who was dead) should represent their father and take one share among them, and that W. S. and P. S. should each take one share absolutely, and not equally with his children.

A legacy to A. and his heirs, is an absolute bequest to A.

62

Mere inadequacy of consideration is not of itself a distinct principle of relief. But palpable and excessive inequality in a bargain; inadequacy of consideration so gross as to shock the conscience, will induce equitable interference on the ground of fraud.

So where there are other ingredients in the case of a suspicious nature, or peculiar relations between the parties; gross inadequacy of price must necessarily furnish the most vehement presumption of fraud.

As a general rule, equity will not relieve against a contract merely on the ground that it was entered into by the parties under a mistake of the law.

Where an instrument is drawn and executed, which professes and is intended to carry into execution an agreement previously entered into, but which by mistake of the draftsman either as to facts or law does not fulfill that intention; or violates it, equity will correct the mistake so as to produce a conformity in the instrument to the agreement.

*J. W. Miller* and *I. H. Williamson,* for complainants.

*Anderson* and *Drake,* for defendants.

THE CHANCELLOR. The executors of Peter Wintermute, late of the county of Sussex, deceased, come into this court to enforce the payment to them of a legacy, which by the last will and testament of John Snyder, deceased, was bequeathed to William Snyder and his heirs; and which, after the death of the said John Snyder, the testator, was assigned over by the said legatee to the said Peter Wintermute, whose executors now claim.

The facts necessary to a proper understanding of the case are these:—John Snyder made his will in eighteen hundred and six, and having a wife, but no children, he bequeathed to his wife his real estate, and so much of his personal as she might choose to take, to be held and enjoyed by her during her natural life. He then ordered, that after the death of his wife, his personal and real property should be sold and divided, two thirds to his relations, and one third to his wife's relations; "that is to say, the two thirds shall be divided, share and share alike, between the heirs of Joseph Snyder, William Snyder and his heirs, and Peter Snyder and his heirs; and the one third shall

be divided between Andrew Metzer and his heirs, and Margaret the wife of Jacob Miller and her heirs." The division was ordered to be made by his executors within a reasonable time after the decease of his wife, not to exceed three years after her decease.

John Snyder, the testator, died in eighteen hundred and fifteen. His wife survived. In June, eighteen hundred and twenty-three, William Snyder assigned over to Peter Wintermute, all his share and interest in the estate of John Snyder, under the will aforesaid.

In eighteen hundred and twenty-seven, William Snyder died intestate, leaving children and heirs at law, all of whom are parties to this suit.

In eighteen hundred and thirty-two, Catharine Snyder, the widow, died; whereupon the surviving executors converted the whole estate into money, and in eighteen hundred and thirty-three settled their accounts in the surrogate's office of Sussex, and there was found to be a balance in their hands to be divided among the residuary legatees, according to the will, of twelve thousand one hundred and nineteen dollars and twenty-one cents.

Of this residuum, the complainants demand the one third part of the two thirds, which was given by the testator to his own relations; or, in other words, they claim the share which was bequeathed to William and his heirs; and they produce the assignment as evidence of their claim.

The executors and most of the heirs at law of William Snyder have answered the bill, resisting the claim thus made.

It is admitted by the solicitors that the testator had three brothers, Joseph, William and Peter. Joseph was dead when the will was made, and left nine children. William and Peter survived the testator, but both died, leaving children, in the life-time of the widow.

Before examining the assignment, the operation of which is a matter of dispute between the parties, it becomes necessary to settle in the first place, whether the legacies given under the will to the different legatees, vested on the death of the testator, or not

until the death of the widow; and if vested at the testator's death, then to ascertain what share William took under the will; whether the legacy to him and his heirs, is a legacy to him alone, in fee, or to himself and his children in equal shares; for it is contended by the defendants that the legacy was not a vested one, or if it was, that William took equally with his children.

As to the first point, I am clearly of opinion that the legacies vested on the death of the testator. The legacies are independent. They are subject to no contingencies, such as the attaining of a particular age on the part of the legatees; marriage, having issue, &c. Nor is there any limitation over. The time of payment is postponed, that the widow may enjoy the full benefit of the estate during her life time. Upon her death a division is to take place. The general rule appears to be well settled, that in all cases where payment is deferred on account of some interest in the subject being given to a person on whose death it is to take effect, the bequest is considered as independent of the time mentioned, and the legacy is vested at the death of the testator; but where time is annexed to the substance of the legacy, it does not vest before the period mentioned: *Hatch* v. *Mills*, 1 *Eden*, 342; *Monkhouse* v. *Holme*, 1 *Bro. C. C.* 298; *Attorney General* v. *Crispin*, 1 *Bro. C. C.* 386; *Walker* v. *Main*, 1 *Jac. and Walk.* 1; 1 *Rop. on Legacies*, 396; *Dawson* v. *Killet*, 1 *Bro. C. C.* 119, and the note, in which most of the cases are collated.

In this case, the time is not of the substance of the legacy. The testator intended that the relatives of himself and his wife, as designated in the will, should have his property. If his wife had not been living, he would have given it to them at once. Their right to it was not made to depend on any contingency annexed to the gift and constituting a part of it. The enjoyment was simply postponed for the benefit of another. The purpose of the testator was to give interests to different persons in succession. Each gift was alike immediate, though the second takers could not have the benefit until after the death of the first. This is the doctrine held by lord Eldon in *Blamire* v. *Geldart*, 16 *Ves.* 315. There the testator gave his property to his wife, and gave George

Pringle two hundred pounds at his wife's decease. Pringle died before the widow. The legacy was held to be vested, and the chancellor said, If the testator had given the stock to his wife for life, and at her death to George Pringle, it would have been clear that he would have had a vested interest in the nature of a remainder ; and as she has clearly only a life interest in this portion of the stock, the legacy vested on the testator's death, and was not defeated by the death of the legatee, in the life-time of the wife. A nice distinction has been attempted in the books between ordinary legacies, and those which are residuary, but the same rule has usually been applied to both. And so, where the legacy is in the nature of a charge on real estate, a different construction has sometimes prevailed. It can have no effect on this case, however, for the testator contemplated that his executors should sell his real property and convert all into money, in the life-time of the wife.

This question has been settled in this court on more occasions than one, I appehend, but there is no report of it. It came up in the supreme court in the year eighteen hundred and eleven, in the case of *Fairly* v. *Kline*, 2 *Penn.* 754. In that case the testator gave his farm and some personal property to his wife during life or widowhood, and upon her death or marriage ordered his executor to make sale of the whole, and gave the proceeds, after paying charges, &c., to his eight children, to be equally divided among them. One of the children died before the widow, and the question was whether the legacy was vested. The court was unanimously of opinion that the legacy vested. The chief justice, Kirkpatrick, inclined to think the fund was to be considered as money, and that the rules applicable to ordinary legacies would well apply, as the land was to be converted into money by the executor for the benefit of the family. But even if it were held a legacy charged on land, he maintained it was vested, on the principle that the day of payment was merely postponed for the benefit of the estate and family. He says, "It is postponed in order to make a comfortable provision for the widow, and that too in lieu of dower. If this necessity had been

out of the way, the distribution would have been immediate. There was no consideration, no circumstance, no contingency immediately connected with this legatee, which was the ground of the postponement." And this is undoubtedly the true principle.

It is next to be ascertained, whether William Snyder was entitled to the whole of the legacy, it being given to him "and his heirs;" or whether his children were entitled to any part of it as legatees under the will.

The intention of the testator appears to me to be plain. He intended to give two thirds of the property to his own relations. He had two brothers living; another brother was deceased, leaving children. He says, "the two thirds shall be divided, share and share alike, between the heirs of Joseph Snyder, deceased, William Snyder and his heirs, and Peter Snyder and his heirs." He meant that the heirs of Joseph, who was dead, should represent their father and take one share among them, and that Peter and William should take the other two. The words "and his heirs," may have been adopted as words of perpetuity. It can scarcely be supposed that he meant to give the children of William and Peter an equal share with their fathers. Why should he do it? They were not related to him in equal degree, being merely nieces and nephews, whereas their fathers were brothers of the testator. If Joseph had been living, he would doubtless have given one portion to him and his heirs, as he did to William and Peter and their heirs, and the portion belonging to that side of the house would have been properly due to the three brothers.

And this agrees with what I consider to be the legal construction of the phrase. A legacy to A. and his heirs, is an absolute bequest to A., and the whole interest vests in him for his own use. This is the general principle, and I perceive nothing in this case to form an exception to it. It was held in a late case before sir John Leach, vice chancellor, that even a bequest to C. C. and the heirs of her body, was an absolute legacy to the legatee: *Crawford* v. *Trotter*, 4 *Mad.* 361. There is a class of cases in which it is decided that the word heirs may be construed to

mean children. They refer to wills in which it is very clearly shown that the testator so intended to be understood, and need not be canvassed here; for there is nothing in this will to induce the belief that the testator had any such intention.

This being, then, a vested legacy, and the right to it being in William Snyder, he had power to make an assignment; and the complainants are entitled to recover the property or interest assigned, unless the deed or instrument of assignment can be avoided, either in whole or in part.

An effort has been made to show that it was intended to be in the nature of a mortgage, and by parol evidence. This would be to contradict the written instrument, and cannot be done except under peculiar circumstances, which do not exist in this case.

There is certainly no fraud made out. There is no reason to suppose that any thing fraudulent or improper was intended on either side. The whole transaction appears to have been conducted with fairness by both parties. There is no direct fraud set up in defence, and there is none proved.

Inadequacy of consideration has been relied on to set aside or invalidate the agreement. The evidence offered in support of this was objected to. Such part of it as does not contradict the instrument, may be received. The deed of assignment does not express any definite consideration. It purports to have been made in consideration of a large sum of money due upon certain bonds, notes and obligations executed by said William Snyder to said Wintermute, and for money due upon the books of account of said Wintermute, and for the sum of one dollar. It is competent for the defendants to show what the actual consideration was, but not to show there was none whatever: *Brown* v. *Bell*, 20 *John. Chan. R.* 338; *Bullard* v. *Briggs*, 7 *Pick.* 537. In this last case, chief justice Parker held that more or less than is expressed in a deed may be proved by parol evidence as the consideration; and even a different consideration, if valuable, may be proved.

For the purpose of showing the actual consideration of the assignment, the defendants have produced a receipt, in the follow-

ing words, viz.: "Received June eleventh, eighteen hundred and twenty-three, of William Snyder, the sum of one hundred and sixty dollars and eighty-eight cents, by assignment to me of his share of his brother John Snyder's, deceased, estate ; I say received by the said assignment as above stated, in full of all accounts, by me,                    PETER WINTERMUTE."

There is no doubt that the sum mentioned in the foregoing receipt is the true consideration, and that it then purchased an interest which is now worth more than two thousand dollars. There would seem, at first view, to be no equity in this ; but to set the contract aside on that ground would work still greater injustice and mischief.    Mere inadequacy of consideration is not, of itself, a distinct principle of relief.    This has been repeatedly determined, and it was decided in this court in *Simmons* v. *Vandegrift, Saxton*, 55.   " The common law, (says a learned judge,) knows no such principle.    The consideration, more or less, supports the contract.    Common sense knows no such principle.    The value of a thing is what it will produce, and it admits of no precise standard.    It must be, in its nature, fluctuating, and will depend on ten thousand different circumstances.    One man, in the disposal of his property, may sell it for less than another would.  He may sell it under a pressure of circumstances which may induce him to part with it at a particular time.    If courts of equity were to unravel all these transactions, they would throw every thing into confusion, and set afloat the contracts of mankind." Lord chief baron Eyre, in *Griffith* v. *Spratley*, 1 *Cox*, 388.

Still there may be such unconscionableness, such palpable and excessive inequality in a bargain, as to induce equitable interference.    But in all such cases, the court goes on the ground of fraud, being satisfied that gross imposition or undue influence must have been practiced.    If the inadequacy be such as to shock the conscience, it will amount to evidence of fraud, and will be so considered : *Coles* v. *Trecothick*, 9 *Vesey*, 246 ; *Copis* v. *Middleton*, 2 *Mad. R.* 409 ; *Peacock* v. *Evans*, 16 *Vesey*, 512 ; *Osgood* v. *Franklin*, 2 *John. Chan. R.* 1 ; 1 *Story's Eq. Ca.* 251, and the cases there cited.    So, too, when there

are other ingredients in the case of a suspicious nature, or peculiar relations between the parties, gross inadequacy of price must necessarily furnish the most vehement presumption of fraud : 1 *Fonb. Eq.*, Bk. 1, ch. 2, sec. 9, note *a.* ; 1 *Story's Eq.* 251.

I find in the present case no circumstances or ingredients which will warrant me in considering it one of constructive fraud. It is not sufficient that the one party was a debtor and the other a creditor. The debtor was not in distress, or even pressed. There was no anxiety on the part of the creditor to procure this assignment in satisfaction of his debt, but rather the reverse. And when it is remembered that some of this property was in the hands of the widow, who might live a number of years; that the amount to be divided was uncertain on that account; that difficulty might arise as to the construction of the will, and that it might be doubtful whether the assignor had really any vested interest or not, the inadequacy is not so great as it first appears to be. And when it is seen that the bargain was freely made, and in good faith, it cannot be disturbed on either of the grounds taken. "The difficulty of adopting any other rule, (says justice Story,) which would not in the common intercourse and business of human life be found productive of serious inconvenience and endless litigation, is conceded by civilians and publicists; and, for the most part, they seem silently to abandon cases of inadequacy in bargains, when there is no fraud, to the power of conscience and morals and religion :" 1 *Story's Eq.* 250, 251.

If the defendants are entitled to any relief whatever, it must be on the ground that the parties to the assignment acted under a mistake of the law. That this was the fact, I do not doubt. The amount of the consideration, and the face of the deed of assignment, both prove it. To the deed, and on the same paper, there is appended this writing :—" We the subscribers, the children and heirs of William Snyder, of the township of Hardwick, in the county of Sussex, for the consideration expressed in the foregoing deed, do hereby confirm, ratify and agree to the same ; and grant and assign to the said Peter all our right, interest and demand, of, in and to the estate, money, goods and

chattels, in the foregoing deed granted and assigned, or meant or intended to be granted or assigned. Witness our hands and seals, the day and year above written." This supplemental writing, which is signed by only one of the children, (George Snyder,) shows the belief of the parties to have been, that Mr. Snyder, the father, who made the assignment, had only an equal share with his children in the legacy, and that his assignment would pass nothing more. Hence the effort was made to get the children to join.

There was also a mistake of the law as to the vesting of the legacy. They supposed at the time that if Mr. Snyder should die before the widow, his share would lapse, and of course Wintermute would get nothing, unless the children should also agree to the transfer. This is shown by the answer of some of the heirs, and goes far to throw light on the whole transaction. They allege that they heard Peter Wintermute, after the assignment, say, that he thought and believed if the widow should outlive Mr. Snyder, he would lose the share that had been assigned to him. And again, George Snyder, one of the defendants, says, that Wintermute told him at another time, that if the widow should outlive Mr. Snyder, that the share he had would be lost, and proposed that if he, George Snyder, and Henry Pippenger, (who had married one of William's children,) would give him their note of hand, payable for fifty dollars, he would give up the assignment to them; and the defendant replied, that for his part he would not do it, but that Pippenger might do it if he thought proper.

I think, then, it is clear from the deed itself, from the answer, the evidence, and the general circumstances, that the parties acted under this mistake. All, however, was done in good faith, and the question then presents itself, Can this court grant relief? The general rule is clearly against the exercise of such power. Agreements made and acts done under a mistake of law are generally held valid and obligatory, if not objectionable by reason of fraud, misrepresentation, or some other matter, which will afford a foundation for equitable interference. The rule is very

clearly and decidedly given by the supreme court of the United States, in *Hunt* v. *Rousmaniere*, 1 *Peters*, 15, that a mistake of the law is not a ground for reforming a deed founded on such mistake; and whatever exceptions there may be to this rule, they are not only few in number, but they will be found to have something peculiar in their character, and to involve other elements of decision.

One of the strongest authorities in opposition to this principle, is that of *Lansdowne* v. *Lansdowne*, *Mosely's R.* 364; in which the legal rights of two brothers to lands which had descended from a third one, was referred by them to a country schoolmaster; who, on consulting a book called the *Clerk's Remembrancer*, gave it in favor of the youngest brother, because lands could not ascend. Lord chancellor King ordered the conveyances to be given up, as being obtained by mistake and misrepresentation. There being misrepresentation as well as mistake, the authority would pass for little, but for the dictum which follows, in which the chancellor lays down the broad principle, that the maxim, *ignorantia juris non excusat*, was in regard to the public, that ignorance of the law cannot be pleaded in excuse of crimes, but it did not hold in civil cases. This broad doctrine is untenable, and has led to some confusion, but it ought not to unsettle the law. The decree itself was, that the agreement was obtained by a mistake and misrepresentation of the law. This case was examined, and its authority doubted, by the supreme court of the United States in the case above referred to.

In *Willan* v. *Willan*, 16 *Vesey*, 81, 82, the court relieved because the party did not understand the effect of the agreement; but the want of understanding was occasioned by ignorance and imbecility of mind, implying a want of capacity to understand, which makes a material difference. There is another class of cases which seem to militate, at first, against the rule, in which the court has relieved on the ground of surprise, mixed up with a mistake of law; but they do not, on examination, affect it. They go on the ground of breach of confidence, where the par-

ties stand in a confidential relation to each other, (*Lady Ormond* v. *Hutchinson*, 13 *Vesey*, 51,) or that the party had not sufficient time to act with caution, and was therefore surprised by an improvident act, (*Evans* v. *Llewellin*, 1 *Cox*, 340,) or that he had not the protection he ought to have had. Cases of infants dealing with guardians, and of sons with fathers, all proceed on this ground or a similar one, that if the party is in a situation in which he is not a free agent, and is not equal to protecting himself, this court will protect him : 1 *Cox*, 340, same case.

If in this case there was any mistake in the instrument itself, so that it did not contain in it what the parties had agreed on, a very different case would have been presented; for where an instrument is drawn and executed which professes or is intended to carry into execution an agreement previously entered into, but which by mistake of the draftsman either as to fact or law, does not fulfil that intention, or violates it, equity will correct the mistake so as to produce a conformity to the instrument: *Opin. of justice Washington*, in *Hunt* v. *Rousmaniere*, 1 *Peters' Sup. C. R.* 13—17. Here there was no such mistake. The instrument conveys just what the parties intended. Snyder intended to assign all his interest in the estate, and Wintermute intended to receive it; but as to what that interest was in law, they made a mistake.

In *Lyon* v. *Richmond*, 2 *John. Chan. R.* 60, the general principle, as above stated, is approved and adopted. " The courts (says chancellor Kent,) do not undertake to relieve parties from their acts and deeds fairly done, though under a mistake of the law. There is no other principle which is safe and practicable in the common intercourse of mankind."

I would not be understood as saying that no case can possibly occur in which the court would not interpose and relieve against a plain mistake, arising from ignorance of law. The supreme court of the United States did not go so far, nor has any other court. But surely the case in which an interference would be proper must be a very special one, and should show a very plain, clear mistake. And even then courts should be cautious; for

what one may suppose a plain point of law, another one may think equally plain, and yet construe it very differently.

From these premises it is clear that the court should not interfere to set aside this assignment. It is founded on a construction given to a will. The testator, and also the assignee, construed it one way, and acted accordingly, in perfect good faith. Their representatives think differently, and with their opinion the court coincides. But the case is one upon which men, and perhaps professional men, may honestly differ; and if the court should undertake to interfere in such and all similar cases, it would not want for employment; for in no instances are parties more liable to be deceived than in the construction of wills; upon no subject known to the law is there so much uncertainty.

I have come to this conclusion with some reluctance, especially as this part of the case was not spoken to by the counsel. If I had seen my way clear to afford relief in a case of so much hardship, I should have given it.

If the complainant had come here seeking the extraordinary aid of the court to enforce this assignment; if it had been an ordinary agreement or contract, the specific performance of which he sought to enforce through the power of this court, and which could not be enforced elsewhere, the court might well pause before it gave any assistance. It might turn the party over to a court of law, to seek a remedy in damages. But in the recovery of legacies this court has only a concurrent jurisdiction. The party's remedy is complete at law, and it would answer no useful purpose to turn him over to another tribunal and prolong litigation.

The complainants are entitled to a decree; and it must be referred to a master to take an account of what is actually due under the assignment, and how much it will be necessary to have in the hands of the executors for the maintenance of the slave mentioned in the will, and who is charged on the estate.

The complainants are not entitled to recover costs, there being reasonable grounds for defence. The executors of John Snyder,

deceased, are to be allowed their costs out of the fund recovered, and the other defendants to pay their own costs.

Decree accordingly.