GEORGE B. EARLE, HENRY A. EARLE AND ANNIE A. VAN CLEEF

*v.*

THE NORFOLK AND NEW BRUNSWICK HOSIERY COMPANY.

1. Whatever destroys free agency, and constrains a person to do what is against his will, and what he would not do if left to himself, is undue influ-

Earle *v.* Norfolk and New Brunswick Hosiery Co.

ence, whether the control be exercised by physical force, threats, importunity, or any other species of physical or mental coercion.

2. Undue influence is not measured by degree or extent, but by its effect.

3. When a deed is attacked on the ground of want of capacity in the grantor, the test is, did the grantor possess sufficient mind to understand, in a reasonable manner, the nature and effect of the act he was doing?

4. A witness is not entitled to credit, whose testimony is inconsistent with the common principles by which the conduct of mankind is usually governed.

On final hearing on bill and answer and proofs taken before a master.

*Mr. Socrates Tuttle,* for complainants.

*Mr. Woodbridge Strong,* for defendants.

Van Fleet, V. C.

The complainants seek to invalidate a deed made by their mother. If they are entitled to succeed in nullifying the deed just mentioned, they will be entitled to a like decree in respect to a deed made by their mother's grantee. And also to have a mortgage made by their father and mother, so far as it may affect their estate, set aside. The grounds alleged against the deed of their mother are want of capacity and undue influence.

The complainants are children of Jonathan Earle and P. Augusta Earle. Their father was treasurer of the Norfolk and New Brunswick Hosiery Company from 1868 to 1876. In the latter part of August, or the early part of September, 1875, it was discovered that during the period he had charge of the finances of the corporation, $142,000 had been fraudulently abstracted. Jonathan Earle denied that he had personally misappropriated any of these moneys, or that he was guilty of any wrong in the premises, except carelessness, but charged that his son George, one of the complainants, was the embezzler, and stated that George had obtained the money abstracted by filling up checks which he (the father) had signed in blank, and had lost it in speculations in gold and stocks. At the time the defalcation was discovered, the mother of the complainants held

title to a tract of land, situate in the city of New Brunswick, consisting of thirty-three lots, lying together and constituting a block.

Shortly after the discovery of the defalcation, Jonathan Earle offered to make restitution, and, as part of the means to that end, he proposed to procure a conveyance by his wife of the lots held by her to the president of the corporation, who should at once convey them to him, and that he and his wife should then execute a mortgage on them for part of the sum embezzled. This course was adopted, and on the 1st of October, 1875, a deed for the thirty-three lots was made by Mr. and Mrs. Earle to the president of the corporation, and he, on the same day, conveyed them to Mr. Earle, and thereupon Mr. and Mrs. Earle executed a mortgage for $18,000 on the lots to the president of the corporation. Shortly afterwards, this mortgage was assigned to the corporation, and they still hold it. At about the time of the execution of this mortgage, Jonathan Earle gave other mortgages on real estate in this state and elsewhere, and transferred to the defendants other securities, which, together with the mortgage just mentioned, were sufficient, nominally, to cover the whole of the sum embezzled. Nearly all the other mortgages and securities which were passed over to make good the loss have proved worthless, and if the complainants are successful in this suit, the defendant corporation will find itself, at the end of this litigation, in a much worse condition than if no effort had been made to make restitution.

For nearly two years prior to the execution of the deed in controversy, Mrs. Earle had been afflicted with cancer of the womb. She died from the effects of the cancer on the 10th of December, 1875. The complainants allege, and attempt to prove, that at the time she executed the deed her disease had so far exhausted her physical powers, and so greatly impaired the vigor of her mind, that she was incompetent to make a valid deed. Estimating the evidence produced in support of this contention at its highest value, the most that can be said for it is that it merely shows that her memory was failing. This is not enough to establish incapacity. The test in this class of cases, when they

Earle *v.* Norfolk and New Brunswick Hosiery Co.

are unmixed with fraud, is, did the person whose act is challenged possess sufficient mind to understand, in a reasonable manner, the nature and effect of the act he was doing, or the business he was transacting? If he did, his act must stand. He may be old and forgetful or enfeebled by disease, or irrational on some topics, and yet possess sufficient mind to do the most important act, in respect to his property, of his life. The vital question always, in such cases, is, did he clearly understand what he was doing? The evidence here answers this question in the most satisfactory manner. The physician who attended Mrs. Earle through her whole illness says that at the time of the execution of the deed there had been no failure or impairment of her mind, that he could see. The deed was executed in the presence and under the direction of a member of the bar of this state of the highest respectability. He has related in detail all that transpired at its execution. I shall not restate his evidence; it is sufficient to say that, if his statement is believed (and it is uncontradicted), there can be no doubt that Mrs. Earle clearly and fully understood what she was doing, and that the deed was the free and well-understood act of her mind. Considered as a whole, the evidence in the case not only fails to prove want of capacity, but shows that the deed was the act of a mind, if not entirely unimpaired, possessing very nearly all of its original vigor.

The complainants also allege that the deed should be declared invalid because it is the product of undue influence, and they charge that their father is the person who wrongfully or unduly influenced their mother, and, what is still more remarkable, they produce him as the witness to prove the truth of their charge. Their case, on this point, rests exclusively on his testimony. By his testimony their case must stand or fall. Were it possible, under any condition of facts, to regard him as a trustworthy witness, his testimony should, in consequence of the fact that he stands self-accused of attempting to defraud that person whom, of all others, he was under the highest obligations to defend and protect, be sifted and analyzed with the utmost caution. His attitude before the court naturally excites suspicion. He admits that he has attempted to commit a fraud against his wife, but

professes to have become penitent, and now wants to confess the truth that the wrong he has attempted may be remedied.

But remedied how? By withdrawing from persons whom he has made his creditors against their will, the very property which he has pledged to them, as security for their debt, and turning it over to his children.

The period within which he might have been indicted for his criminal abuse of his trust, has expired, and all fear of punishment is gone; he is insolvent, and if his evidence shall prove sufficient to overthrow this deed, all that his wife contributed to make good his immense defalcation, will be restored to his children, without the least danger of his ever being compelled to restore a dollar of the money abstracted. His position as a witness, it is manifest, is one of extreme temptation. But more, he is master of the situation, and swears without danger of contradiction. He testifies as to what occurred between his wife and himself when they were alone. His wife is dead, and she cannot, therefore, contradict him directly, nor fail to support his evidence in those particulars in which failure to corroborate him might furnish very cogent evidence that his story was an invention. His character and position alike demand that his testimony shall be examined with a jealous care and a watchful scrutiny.

All that can be safely said in the way of formulating a definition of what the law calls undue influence is to say that whatever destroys free agency and constrains the person whose act is brought in judgment to do what is against his will, and what he would not have done if left to himself, is undue influence, whether the control be exercised by physical force, threats, importunity, or any other species of mental or physical coercion. The extent or degree of the influence is quite immaterial, for the test is, was the influence, whether slight or powerful, sufficient to destroy free agency and render the act brought in judgment rather the result of the determination of the mind of another than the expression of the mind of the actor?

The party alleging undue influence must prove it, either directly or by proof of such circumstances as shall clearly warrant its presumption as a conclusion of fact. A deed which appears

Earle *v.* Norfolk and New Brunswick Hosiery Co.

to have been executed under all the safeguards provided by law to protect the grantor against coercion and imposition, is entitled to stand on its own inherent strength. The grantee is not obliged to prove that it is honest or valid.

As already stated, the evidence of undue influence comes from the mouth of a single witness, and is stated with singular brevity. I quote it:

"In the early part of September in 1875, when my wife seemed to be feeling better, I told her that I had promised, that I had given my word, that I would mortgage her property on Livingston avenue; she said that it was an agreement between us that it should never be touched during her life; I said I had promised it, and it must be done; it left her prostrated; nothing more was said to her until I told her I was going after Judge Strong, to have him come that night for her to sign the papers, as I was going to the death-bed of my father the next morning; she raised no objection at that time."

At a later point in his evidence, the witness says that when he told his wife he was going for Judge Strong, he explained to her what the papers were that he wanted her to sign.

Nearly a month, it will be observed, elapsed between the two conversations here detailed. It was in the early part of September, when Mrs. Earle is notified first that her husband had promised to mortgage her property, and that it must be done regardless of her wishes; and it is not until the evening of the 1st day of October that she is told that her husband intends to have Judge Strong come that night for her to sign the papers. In the meantime no pressure is exerted, nor influence exercised; he said nothing to her, in the interval, on the subject. Now, if we suppose his declaration, I have promised it, and it must be done, operated, at the time, as a coercive influence, is it not clear, in view of all the circumstances, that sufficient time intervened between the two conversations to relieve her entirely from its power? from the fact that he abstained from any subsequent mention of the subject, she would naturally conclude, long before the second conversation, that he had abandoned his purpose, and a recurrence to the subject would, therefore, be likely to affect her more seriously than the first mention of it. At all

Earle v. Norfolk and New Brunswick Hosiery Co.

events, the interval between the two conversations was quite sufficient to relieve her from anything like coercive influence.

But is his story reasonable and probable? A witness is not entitled to credit whose testimony is inconsistent with the common principles by which the conduct of mankind is naturally governed.

This witness was in a situation of extreme peril. He was guilty of an enormous defalcation, and subject to criminal prosecution and to have his misconduct blazoned to the world. He had offered to make restitution. His motive in doing so was doubtlsss, in part at least, to prevent exposure and escape punishment. He could not make full restitution without the help of his wife. Her situation at that time, as he describes it, was so distressing as to make it his duty to treat her with the greatest tenderness and affection. Anything in his conduct towards her having the appearance of force or coercion, would not only have been cruel but would have been much more likely to defeat his purposes than to accomplish them. And yet he says that as soon as his wife manifested a disinclination to comply with his wishes he did not, as it would have been natural for him to do, if his description of the situation is truthful, by explanation and entreaty and the use of tender means, attempt to coax her to do what he wanted; but, on the contrary, he says he told her with a brusqueness that, in her situation, as he describes it, was almost brutal, that he had promised it and it must be done. The consequence was, as he says, that she became so prostrated that he did not dare or was not willing to mention the subject again until the hour for action arrived. And then, though he had done nothing in the meantime to bring her into a condition of mind more favorable to his views, and had no reason to believe that a second mention of the subject would not be attended with the same painful and dangerous consequences, without making any further effort, either to change her mind or to ascertain whether she is more inclined to comply with his wishes, he assumes arbitrarily that she will do what he wants, and the result shows that he was right. If Mrs. Earle's opposition to the fulfillment of his promise was as strong and decided as he says it was, it

cannot be believed that she surrendered without cause or motive. It is evident, I think, the whole story has not been told. I am compelled to say, if it be true that Mrs. Earle received his announcement that he had promised to mortgage her property with as much opposition as he says she did, that I think it is quite incredible that he would, without further effort to bring her to his views or to ascertain whether her mind had undergone any change or not, have presumptuously announced that he was going for an officer before whom she must execute the papers that shortly before she had told him, with strong demonstrations of pain, she was unwilling to execute. A course of that kind would have expressed such a contemptuous disregard of her wishes and feelings as would most probably have rendered her opposition unconquerable. His story is so inherently improbable, and the character he has written for himself in this case renders him an object of such extreme suspicion, that I am unwilling by any judgment to deprive any person of his rights, especially rights evidenced by a solemn deed, on testimony so improbable and unsatisfactory.

The complainant's bill must be dismissed, with costs.