Wilkinson *v.* Sherman.

---

## OGDEN D. WILKINSON et al.

*v.*

## CAROLINE SHERMAN et al.

1. A conveyance of a contingent or executory interest, which is made lawful by *Rev. p. 167 § 82*, carries with it the estate which, but for the conveyance, would vest in the grantor upon the happening of the contingency, although the deed may not contain that which will estop the grantor from claiming an after-acquired estate.

2. Where there was a devise to A for the joint lives of himself and B, and in case of the termination of those joint lives by the death of B, to A in fee; and in case of the termination of those joint lives by the death of A, to C and D in fee, and if C be then dead, to D alone in fee, the contingency is not as to the person who shall take, but as to the event upon the happening of which a certain person shall take.

3. The test of mental capacity to execute a deed is, whether the person executing it possesses sufficient mind to understand, in a reasonable manner, the nature and effect of the act he is engaged in.

4. A gift of a contingent right to a remainder in fee in real estate worth $10,000, by a man of ample fortune, who is in full possession of his faculties and mental strength, to an uncle who has a life-interest in the real estate and also a contingent right to the fee, and to whom the nephew is bound not only by blood but also by intimate friendship, when the deed is executed and acknowledged before a reputable lawyer, who is one of the masters of this court, and thereafter is immediately recorded in the public records of deeds of the county in which the land lies, will be sustained.

5. Where one who has a right to demand an explanation of circumstances that surround a transaction alleged to be fraudulent, purposely delays the exercise of such right until all those who could have explained those circumstances are dead, he will not be permitted, in a court of equity, to insist upon that explanation.

On bill &c.

*Mr. Barker Gummere,* for the complainants.

*Mr. John R. Emery,* for the defendant, George D. Scudder, executor of the will of Catharine Dill, deceased.

THE CHANCELLOR.

George Dill, late of Trenton, in this State, died in January, 1857, leaving his last will bearing date on the 6th day of May, 1856, by which he devised to William P. Sherman, "his heirs and assigns," a house and lot on State street, in the city of Trenton, then occupied by the testator's son John, in trust—

"For the following, and no other, uses and purposes, to wit: he and they are to permit my son John to occupy and enjoy the same or to lease it, and receive the rents, issues and profits to his own use (he keeping the same in repair and paying all legal taxes and assessments thereon) during the continuance of the joint lives of my son John and his present wife. Whenever said joint lives shall be terminated, if said termination shall be occasioned by the decease of my said son John, said trustee, his heirs or assigns, is immediately to convey said real estate to my daughter Elizabeth and my grandson Frederick, their heirs and assigns, as tenants in common in equal moieties, or, if either of them be then dead, to convey the whole of said real estate to the survivor, her or his heirs and assigns, forever, or, if both be deceased, then to convey said real estate in fee-simple to the person or persons who may at that time be the heir or heirs at law of the said Frederick, in the same proportions as the said heirs, if more than one, would take by direct inheritance from said Frederick. But if the termination of said joint lives be occasioned by the decease of the present wife of my son John, then said trustee, his heirs or assigns, is immediately to convey said real estate to my said son John, to be held by him, his heirs and assigns, forever."

The testator also gave specified real and personal estate to his daughter Elizabeth, who was unmarried, and other specified real estate to his daughter Sarah, the wife of Ogden D. Wilkinson, during the joint lives of herself and her son Frederick, and

Wilkinson *v.* Sherman.

provided that when one of them should die the survivor should take the property in fee.  The residue of his estate, consisting entirely of personalty, he gave to his daughter Elizabeth, his grandson Frederick and his friend William P. Sherman, in equal shares, the share of William P. Sherman to be upon a trust in all essentials, so far as the testator's son is concerned, similar to the trust respecting the house and lot on State street, in which the son then resided.

On the 28th of January, 1875, Frederick R. Wilkinson executed to his uncle, John R. Dill, a deed which recited that for and in consideration of one dollar to him paid, he had " granted, bargained, sold, aliened, remised, released, conveyed and confirmed," and thereby did "grant, bargain, sell, alien, remise, release, convey and confirm" to his uncle and to the uncle's heirs and assigns, forever, the house and lot on State street, devised in trust as above mentioned, declaring therein his intention to be—

" To vest in and convey to the said John R. Dill, his heirs and assigns, all the interest and right to said premises which I may have acquired under and by virtue of said last will and testament of George Dill, deceased, together with all and singular the tenements, hereditaments and appurtenances thereunto belonging or in anywise appertaining, the reversion and reversions, remainder and remainders, rents, issues and profits thereof, and also all the estate, right, title, interest and right of property, possession, claim and demand whatsoever, as well in law as in equity."

The deed contains no express covenants.

In October, 1880, and while his wife yet lived, John R. Dill, the testator's son, died.  In the absence of the deed above referred to, this event, with the previous death of Elizabeth Dill, the testator's daughter, would throw the equitable fee in the land described in the deed upon Frederick R. Wilkinson, and entitle him to a conveyance from the trustee.  John R. Dill left a will by which he devised all his estate to his wife Catharine.  Upon his death his wife, Catharine, took possession of the house and lot in question, and continued in that possession until her death in 1886.  By her will she directed that the property be sold by her executor, the defendant, George D. Scudder, and that the proceeds of sale be divided among the beneficiaries named in the

will. Frederick R. Wilkinson died in December, 1883. In 1887, after the death of Catharine Dill, the complainants, who are the children and heirs of Frederick R. Wilkinson, commenced this suit to compel a conveyance of the legal title of the house and·lot on State street to them. The executor and beneficiaries under the will of Catharine Dill, and those in whom the legal title to the land rests, are made defendants to this suit. The deed of January 28th, 1875, from Frederick R. Wilkinson to John R. Dill, is assailed upon triple grounds: *First*, that it did not convey the equitable fee afterwards acquired in the land; *second*, that Frederick R. Wilkinson did not possess capacity to make the deed, and *third*, that the deed was the product of undue influence upon Frederick R. Wilkinson by John R. Dill.

*First.* It is insisted that this deed conveyed only the estate that Frederick R. Wilkinson had in the property at the deed's date, that is, the estate he then "may have acquired" in virtue of his grandfather's will, and that such estate was but a possibility and not the vested estate in fee that was acquired five years later. The deed conveyed Wilkinson's right to the property, that is, the contingent right he then had, and out of which a substantial estate might grow. This being a mere possibility could not, otherwise than by estoppel, at the common law, be assigned. *4 Kent Com. 260; Chall. Real Prop. 58; 3 Washb. Real Prop. 370.* But, by our statute (*Rev. p. 167 § 82*), since 1851, it could be conveyed, assigned or charged by deed or will, provided the contingency was not as to the person in whom the future estate should vest.

Because the assignment of a mere possibility was not recognized by the common law, the future estate, upon the happening of the contingency, though in fact the right to it had been assigned, went to the grantor, and the assignee's only protection was in that which would estop the grantor from asserting such after-acquired title. By our statute, the assignment of the contingent right to the future estate, when it comes, follows the right, and vests in him who owns that right. It never becomes after-acquired property in the grantor of the right, and hence if the present contingent right be fully transferred that will be suffi-

Wilkinson v. Sherman.

cient to secure the after-acquired estate to the grantee without invoking the aid of that which may work an estoppel.  I think that this deed sufficiently conveyed all the contingent rights that Frederick R. Wilkinson had in the property, and that therefore, under the view I have taken, it is not necessary to consider whether the deed contains that which will estop him or his heirs from asserting an after-acquired title.

The contingent right assigned by the deed in question is not within the proviso of the statute.

Frederick R. Wilkinson was to take an undivided half of the premises in fee, upon the happening of two contingencies—*first*, that John R. Dill should die before his wife, and *second*, that Frederick R. Wilkinson should survive him.  In addition to this, the death of Elizabeth Dill (who was still unmarried) before her brother John would give Frederick the whole property in fee, instead of a moiety of it.  The person who was to take, Frederick, was certain.  That which was uncertain and dubious was the happening of the deaths in the order necessary to give him the estate. Sir William Blackstone (*2 Bl. Com. 169*) defines the case of limitation to a dubious and uncertain person by the illustration of a limitation to A for life with remainder to B's eldest son (then unborn) in tail.  There the person was uncertain because it could not be said that there would ever be a son of B.  He further (*p. 170*) defines certainty of person and uncertainty in event by instancing the limitation of land to A for life and in case B survives him then the remainder to B in fee.  B was certain, but the event of his surviving A was uncertain.

*Second.*  The deed is assailed upon the further ground that, when it was executed, Frederick R. Wilkinson did not possess sufficient mental capacity to make it.

Mr. Wilkinson was born in 1842, and was educated as a lawyer and admitted to practice his profession in this State, but, having inherited a considerable fortune which afforded him facilities in mercantile pursuits, he abandoned his profession and became a member of a firm of lumber dealers in Trenton, and continued as a partner in that firm and its successors until the Fall of 1877.  For many years he was an active director in the

Mechanics National Bank of Trenton. Through the years 1873, 1874 and 1875, and until about the 1st of June, 1876, he served in the board of directors of that bank upon the discount and other important committees, and, according to the testimony of the only directors who were sworn as witnesses in the case, proved to be a man of excellent judgment and ability as long as he continued to act as a director. He was also a vestryman in St. Michael's Episcopal Church in Trenton, and from time to time attended the meetings of the vestry until April, 1876, and, in that month, was re-elected to the vestry for another year.

The testimony shows frequent instances through the years 1873 and 1874 of business transactions conducted by him, of contracts, deeds, bonds and mortgages drawn by his own hand, and of several instances of business transactions early in the year 1875. In January, 1876, he made a will which was witnessed by two lawyers of reputable standing in Trenton, and in March of the same year he executed a power of attorney to his uncle, John R. Dill, and in doing so impressed the witness to it that he thoroughly understood the nature of the business in which he was engaged. In August, 1876, with his wife and two children, he went to Europe. The evidence shows that while he was there he became dissipated, and yielded to the excessive indulgence of his passions. He came back to Trenton in October of the same year, and then had difficulty with his wife. She had permitted him to take charge of her estate and custody of the securities in which it was invested, and when they returned from Europe in 1876 she endeavored to get the securities from him, and in pursuance of her purpose enlisted James F. Rusling, a lawyer and neighbor, in her behalf. Mr. Wilkinson readily gave Mr. Rusling a statement of his wife's property, but through repeated interviews refused to surrender the securities, resisting all threats and importunity. In February, 1877, Mrs. Wilkinson, by her next friend, filed her bill in this court to compel her husband to account for and surrender to her the securities, and caused him to be served with process of subpœna and injunction, and proceeded with the suit without suggestion that he lacked mental capacity. Throughout the interviews had with Mr. Rusling, Mr.

Wilkinson so acted as to impress Rusling that he possessed excellent business capacity. Almost immediately after his wife's suit was commenced Mr. Wilkinson returned to Europe, and renewed his excesses and lavishly expended money. Within a few months he wasted about $30,000. In April his uncle sent a messenger to bring him home, and late in July of the same year he returned to Trenton. Three months later the partnership with which he was connected was dissolved, and he was placed in the hospital known as Kirkbride's Asylum for the Insane, in Philadelphia. He remained in that institution from November 11th, 1877, to May 20th, 1879, suffering with paresis. While he was there, upon the petition of his mother, a commission was issued out of this court to inquire concerning his mental condition and its effect upon his ability to govern himself and manage his property. The return of the inquisition, on July 2d, 1878, certifies that he was then of unsound mind and unfit to govern himself or his affairs, and that he had been in such condition for sixteen months and upwards.

After his discharge from the asylum in 1879, he resided with his mother, in Trenton, until his death, in December, 1883.

The contention is upon the question whether, on January 28th, 1875, he was incapable of transacting business.

It is very apparent that the majority of the witnesses have difficulty in fixing the times when they saw him act in a manner indicative of mental incapacity and when they were satisfied that he was incapable. In view of the fact that a majority of them had no occasion to associate his noticed incapacity with time, and thus fix dates in their memories, it is not surprising that it is difficult for them, after the lapse of so many years, to speak with any accuracy as to time; and it seems to me to be unsafe, in the case of many of these witnesses, to place reliance in the dates they attempt to fix. It is proved that in 1884 and 1885, and subsequently, Mr. Wilkinson frequently drank to intoxication, and it seems to be fairly suggested that it is impossible to determine how far disinterested and indifferent witnesses may have mistaken temporary intoxication for permanent impairment of the mind.

Dr. S. Preston Jones, who was in attendance upon Mr. Wilkinson while he was at the Kirkbride asylum, was examined as a witness. He states that the average of life after the commencement of paresis is three or four years, and that he was surprised to learn that Mr. Wilkinson had lived until 1883. From the fact of his living so long, the witness concludes that the progress of the disease must have been abnormally slow, and argues that, as the condition of the patient when he was in the hospital indicated considerable advance of the disease, the disease must have existed in him for some years. He describes his patient during his life in the asylum as weak in memory, but little interested, moving with a shuffling gait, silent, seeing with difficulty, careless in dress and in manner of eating, and requiring constant attention. He explains that his physical difficulty was complete paralysis of both sides. He further states that, as a rule, the progress of paresis is gradual, with constant arrests.

"These patients," he explains, "will have a bad spell and take a slip downward, and then they will live for months without a change; then they will have another spell and another slip downward. After these spells they never rise up to where they were before, and then there are in some these apoplectic forms of paresis that take patients off very often."

He thinks that during a patient's indulgence in the gratification of passions the progress of the disease must be more rapid than during treatment in a hospital by skilled physicians, and also that, in the incipient stages of the disease, the patient will be fully capable of attending to his ordinary affairs. He instances the case of a bank-teller, who for months after evidences of paresis appeared, satisfactorily attended to a banking business that required great exactness.

It may be true that when the deed in dispute was executed Mr. Wilkinson was in the first stages of paresis, but it cannot be possible that at that time he was incapable of making that instrument. After the deed was made he maintained his responsible position in the bank for more than a year, taking an active part at numerous meetings without so acting as to awaken the suspi-

cions of his fellow-directors, and for nearly three years thereafter he continued his lumber business partnership. The inquisition of lunacy found his incapacity to date from the time when his wife commenced her suit against him, and he departed for a protracted debauch in Europe. That inquisition *is* entitled *to* the greatest consideration, for it was taken in Trenton, where he had always lived, and in the year 1878, when the remembrance of his habits was fresh and dates could be easily fixed.

The test of mental capacity is, whether he possessed sufficient mind to understand, in a reasonable manner, the nature and effect of the act he was engaged in. *Earle* v. *Norfolk and New Brunswick Hosiery Co., 9 Stew. Eq. 188; S. C., 10 Stew. Eq. 315.*

I think, after careful examination of the testimony, that incapacity does not appear.

*Third.* Upon the question of undue influence the mental condition of Mr. Wilkinson is material in another view. A person may possess sufficient capacity to understand the nature of the transaction in which he is engaged, and to make a valid deed when left to his own free will, but yet may be so weakened in mind as to be unable to resist or guard against unfair importunity, craft and fraud. When it is shown that the mind of the grantor was enfeebled, and that he was suspiciously subjected to the influences of the grantee to whom he conveyed valuable property for a grossly inadequate consideration, the courts will require that it be made to appear affirmatively that the grantor understood the nature of his act, and was not led to it by unfair influences. *Haydock* v. *Haydock, 7 Stew. Eq. 570; 2 Pom. Eq. Jur.* § *947.* The insistment of the complainants is, that Mr. Wilkinson's mental power was weakened by intemperance and disease; that Mr. Dill was an uncle with whom he was upon intimate terms, his boon companion in intemperance and his confidential business adviser; that when the deed was executed the grantee was present; that by its terms the deed purports to be one of pure bargain and sale, by which $10,000 worth of property was conveyed in consideration of one dollar, and that it was executed in the presence of two witnesses, an unusual pro-

ceeding in the office in which it was drawn. It is claimed that. these circumstances throw upon those who would claim under the deed, the burden of showing that the transaction was one in all respects fair and in good faith. If it be admitted that the proofs establish the facts as they are stated in this proposition, there can be no doubt that the burden of showing the fairness of the transaction is upon the defendants. I cannot, however, accede to the facts stated in the proposition. I do not think that, at the time the deed was made, Mr. Wilkinson's mind was materially weakened, even though at that time there may have been some physical manifestation of the existence of the disease that ultimately destroyed his mental power. The instances in which ability and strength of mind and purpose are shown, about the time and after the execution of the deed, have too much force to leave Mr. Wilkinson's mental condition in doubt. Opinions of witnesses as to mental capacity, unsupported by facts to show that the opinions are well grounded, are of no value in a judicial inquiry of this kind, but the opinions of bank officers and lawyers with whom the subject of the inquiry is shown to have frequently dealt, and who were so situated with reference to him in their dealings that incapacity must have obtruded itself, cannot but be of controlling weight. Mr. Wilkinson attended upwards of fifty meetings of directors at the bank in a little more than a year after the deed was executed, and did nothing to disabuse his fellow-directors' opinion that he was a shrewd, capable and self-reliant man. And he so conducted himself in his frequent business dealings with the lawyers, Richey and Rusling, as to impress. them that his mind was vigorous as late as 1876. In the face of evidence of this character, it appears to me to be impossible to say that, in January, 1875, Mr. Wilkinson was incapable of resisting improper influences.

Possessed of mental strength, I fail to perceive why he may not have made this gift to his uncle, and that by an instrument which in form imported that the transaction was purely a. matter of bargain and sale. It is true the consideration in a deed of bargain and sale may be so unconscionably small as to afford in itself evidence of fraud, and demand explanation, but

at the same time it may be so merely nominal as to materially aid an explanation that, though in the form of a contract, it was really a gift. I conceive this to be the office of the deed's nominal consideration here. One dollar for $10,000 worth of property is so beyond pretence of more than mere formal consideration that its effect on our minds is not merely the suggestion of fraud, but also the exclusion of the idea that bargain and sale were really intended. The explanation of this transaction I think is apparent. The will of George Dill discloses that the primary object of the contingent devise to Frederick R. Wilkinson was not because the testator desired to give him the State street house after John R. Dill's death, but because he desired to so provide that the house could not by any possibility become the property of John R. Dill's widow. If John R. Dill had survived his wife he would, under his father's will, have taken the house in fee. The trust was not devised as a punishment for him, for his father gave him as unlimited control of the trust property as the existence of the trust would permit and, at the same time, made him one of the executors of the will, and provided that the expense of the trust should come out of the entire estate, and not out of John R. Dill's share of it. The cause of the prejudice against the daughter-in-law does not appear, but that it did exist and that its exhibition in the will was a source of mortification and annoyance to John R. Dill is manifest. The man thus annoyed and mortified was the uncle and intimate friend and companion of Frederick R. Wilkinson. Frederick R. Wilkinson was a man of independent fortune, of excellent ability and engaged in a profitable business, and his wife was possessed of even a larger fortune than he. They had more than enough for their children. The interest in the uncle's house was merely a contingent right. What more natural than to gratify this friend and relative by releasing that right? It was a generosity that, in view of Mr. Wilkinson's surroundings, became almost a duty. Mr. Dill's solicitude for the welfare of his nephew and the nephew's estate, after the deed had been made, and when the ravages of disease became apparent, evinces that his friendship was not merely time-serving until the deed should be executed.

Wilkinson v. Sherman.

It is true that we have no statement of what occurred at the very time when the deed was drawn and signed. Mr. Richey and his clerk recognize their signatures as witnesses to the deed. Mr. Richey thinks that Messrs. Wilkinson and Dill were together, and this is the only proof that Mr. Dill had anything to do with the execution of the deed. It is only Mr. Richey's vague recollection. Dill and Wilkinson were frequently together at Mr. Richey's office, and it seems to me by no means certain that Mr. Richey is right in his conjecture that they were together at the time this deed was executed. Mr. Richey took the acknowledgment to the deed. Nothing that occurred in any part of this transaction appears to have left any impression upon his memory or upon the memory of Mr. Maple, who was the second witness to the deed. It can hardly be possible, if there had been any noticeable incapacity or fraud, that Mr. Richey would have failed to detect it, or that, in such case, he would have witnessed the deed and taken and certified to Mr. Wilkinson's acknowledgment that it was his voluntary act and deed. The recording of the deed two days after its execution is not in keeping with a fraudulent or clandestine proceeding. The only other persons who could have known of the transaction are dead. The unfortunate relations between Frederick R. Wilkinson and his wife preclude the probability of his having mentioned the transaction to her, and Mrs. Dill, who, for obvious reasons, was fully cognizant of the entire transaction, died before the complainants filed their bill. The proofs, then, present an entirely different proposition from that for which the complainants contend. They show a gift of a mere contingent interest in land which possibly had its origin in prejudice, and the existence of which worried and mortified the donee, by a nephew in full possession of mental strength and faculties and possessed of large fortune, to an uncle to whom he was bound not only by blood but also by intimate friendship, which is made by an instrument that was executed in the office and in the presence of a lawyer who is distinguished for conscientious care and integrity, solemnly acknowledged before that lawyer as a master of this court, witnessed not only by the lawyer but also by his assistant, and promptly entered in the public

records of the county. Such a transaction cannot be impeached in this court.

An important circumstance militates against the claim of the complainant, Ogden D. Wilkinson, for relief, which I think should be referred to. The disputed deed was executed in 1875. John R. Dill died in 1880, leaving a will by which he bequeathed his entire estate to his wife. That wife survived him six years, and in that time she remained in undisputed possession of the lands in question, receiving the rents, issues and profits from them. It is true that Frederick R. Wilkinson was insane in 1877, but his mother was his guardian from 1880 to 1883, and knew of the provisions of the grandfather's will. From a few months after his death in 1883, the complainant, Ogden D. Wilkinson, one of his heirs, was of full age, yet Mrs. Dill was suffered to die before any step was taken to assert the claim now advanced by him. More than this, Ogden D. Wilkinson swears that he knew Mrs. Dill was in possession of the property, and that he was advised by his grandmother, who had been his father's guardian, as I have stated, not to make "a fuss" about it until Mrs. Dill should die. If the circumstances of the making of this deed were such as to demand explanation from those who claim under it, it becomes manifest that equity requires that that explanation should have been demanded before the death of possibly the only person who could have given it. After deliberate and intentional delay until the death of that witness and the possibility of explanation is thereby extinguished, it is most inequitable that one who so purposely delays should now be permitted to say that such explanation is necessary to ensure title under the deed.

I will dismiss the bill, with costs.