Collins v. Collins.

JOHN COLLINS et ux., appellants,

*v.*

ISAAC R. COLLINS, respondent.

1. A bargain by a son to keep and maintain his father during life, in consideration of a conveyance of real property, is, in the absence of fraud or undue influence, a valid agreement, and a conveyance made in pursuance thereof will be sustained. The fact that the father died before the expense incurred by the son for his maintenance equaled the full value of the property conveyed, is without significance, if the bargain, when made, was without fraudulent procurement.

2. The mere fact of kinship will not, in such a case, raise a presumption of undue influence; it is, at most, only a link in the chain, and may be rebutted by the other facts in the case.

3. Where a deed is legally executed by a grantor, and regularly recorded by the grantee, delivery will be presumed where the transaction would otherwise stand without rational explanation, unless such a presumption is repelled by the other proofs in the case.

On appeal from a decree advised by Vice-Chancellor Bird, who filed the following conclusions :

Noah Collins died November 21st, 1881, leaving three children, Isaac, Andrew and John, him surviving. He was the owner of four lots of land ; but on November 15th, six days before his death, he made acknowledgments of two deeds, which purported to convey the said lots to the said John in fee. These deeds were not recorded until the day of the death of the grantor. They were recorded before midday, and the father died about six o'clock in the morning. The complainants file their bill, and ask to have these deeds declared void. The material allegations upon which this prayer rests, are undue influence and a want of consideration. At the time of the execution of these deeds, the father had been living with John about three months, and about four months at the time of the acknowledgment of them (they having been written, and perhaps executed, four weeks before they were acknowledged), he having gone to live with John some time in July. Previous to this he had been living with Andrew for about four months. John says that when his father came to him in July, he complained of cruel treatment at the hands of Andrew and his children, and added that he would be obliged to go to the poor-house unless he (John) would take care of him. John says that his father then said that, if he would take him in, he would deed all of his property to him. So far as the case shows, the land in question is about all of the estate that Noah was then possessed of, and was worth from $2,500 to $3,000 or $4,000. If there was more, I think it was incumbent on the defendant, John, to have shown it. This, I think, will appear more clearly when all the case is presented. Indeed, I think the burden of showing that these deeds were fairly obtained from the father, and without any undue influence on the part of John, rests on John, before he can expect a decree in his favor on the insistment that the lands were given to him. This seems to be especially so from the circumstances of the case. The father was about eighty years old, and very feeble. He had been afflicted for many months previous, if not many years, with malaria. Andrew

says that his father was not a lunatic, but had become very feeble-minded from the effects of this disease. A brother of Noah testified to the evil effects of this disease, and declared that, in his judgment, Noah had been unfit to do business for years. It is admitted, on behalf· of the defendants, that the father was feeble in body, but it is at the same time insisted that he was not weak or feeble in mind. John says that after he came to his house he was about a good deal; was not confined to the house all of the time. He says that he chopped wood at the door, and helped him husk corn. He also says that he was out of the house twice after the day (November 15th) on which the deeds were acknowledged, the last time being November 19th, only two days before he died. The father was very much averse to submitting to medical treatment, insisting upon prescribing for himself. But, as I understand John, a few days before the acknowledgment of the deeds, he took the responsibility of calling in a physician, but just how many days this was before the 15th of November, the day of such acknowledgment, is not shown. When the commissioner who took the acknowledgment called, on the 15th, for that purpose, the father was lying on a couch, and on that couch he remained, but in a sitting posture, while he acknowledged the deeds. He did not sign them then—they had been signed before; but how long, or under what circumstances, does not appear, nor is there any direct evidence that the deeds were ever delivered to John. It is true that there is the ordinary clause, "signed, sealed and delivered," and also the acknowledgment of delivering the same as his "voluntary act and deed," but there is no other testimony of the actual delivery of these deeds. While it is true that John can claim the benefit of the presumption which the law attaches to such considerations, I think that I am warranted in calling attention to the fact that there is no proof to show that these instruments ever were handed to John by his father, or by his direction. The physician who was called just before the deeds were acknowledged was unable to attend in due time again, and therefore procured another to do so in his stead. The latter called on the 18th, and he was called as a witness. He says the father was a very feeble old man, and, in his judgment, was incapaci-

tated to do any business. The physician who was called first was not produced as a witness. It would have been more satisfactory had the defendant, John, placed this medical expert on the witness-stand. The next day after the doctor made his last call the old man was out of doors, but died the second day thereafter. As already stated, he died about six o'clock in the morning, and before noon John carried the deeds to the clerk's office, a distance of over three miles, and left them there to be recorded. Again, I say, how or when he got possession of them does not appear.

As I understand the counsel of John, his insistment is, that the father intended to give these lands to John. If this view were fully supported by the proof, the court might find it somewhat difficult to resist the contention, were it to become satisfied that there had been a delivery. The cases all show that courts of equity do not interfere with such donations when understandingly made. *Haydock* v. *Haydock*, *6 Stew. Eq. 494, 7 Stew. Eq. 570; Huguenin* v. *Baseley, 2 Lead. Cas. Eq. 1156*, and notes by the English editor, and American notes, *1192 et seq.* But I cannot come to the conclusion that Noah intended to make a gift in this instance. The language used in the deeds repels any such view. In the one deed is this expression, " in consideration of a claim of six hundred and fifty dollars ;" in the other is this, " in consideration of support and of one dollar." John says that these deeds were written in his house by his son, at dictation by his father, and that, too, a month or so before they were executed. Most clearly the father never intended to make a gift of these lands to John. John says that the $650 were to be paid by him in discharge of a bond and mortgage given by his father. But John has not discharged them, but procured an assignment of them to be made to his wife, upon her paying the amount due thereon with her own money, and she now claims to hold them in her own right. Clearly enough he has not paid the consideration expressed in that deed. In speaking of the other deed, John swears that the consideration was for services rendered to his father; but he also swears that, after his father's death, he filed a claim with the administrator for services

Collins *v.* Collins.

which he had rendered his father, which included the whole period of time his father was with him, being from about the middle of July until the acknowledgment of the deeds, being the 15th of November ; and, when inquired of respecting the fact that the consideration in the deeds and the subject-matter of his claim were both for services, he said that the claim was for services rendered before the deed was acknowledged, and that the deed was for services to be performed afterwards.   The services so rendered, after the deeds were acknowledged, were only of six days' duration.   It should be borne in mind that John swears that these lands were worthless.

With these facts before me, I cannot conclude that John can hold these lands as a gift; nor can he hold them as a purchaser for a valuable consideration, for, so far as appears, he gave nothing for them; the mortgage which was to be paid by him he has not paid, and the support which he was to render, and did render, was so inconsiderable that it cannot be regarded, except in the light of being grossly inadequate.   Nor can he claim that he is entitled to hold this title because of the risk which he took, for, according to his own statement, he never undertook any such risk at all until six days before his father died, when, according to all the testimony, his father was in a very feeble condition.   As intimated, these lands are worth at least $2,500, one witness fixing the value at $4,000, and one at $5,000, while John swears that they are of no value above the mortgage.   I think John has utterly failed to show either a valid gift or a purchase which a court of equity can uphold.   The complainants are entitled to a decree, with costs.

*Mr. Frank E. Bradner,* for the appellants.

*Mr. John H. Jackson,* for the respondent.

The opinion of the court was delivered by

Garrison, J.

Noah Collins, who had three sons, Isaac, Andrew and John, died at the house of John, with whom he had, a short time be-

fore, taken up his residence. A week prior to his death, which occurred on November 21st, 1881, he conveyed to John, by two deeds of conveyance, four lots of land, subject to two mortgages. In 1887 Isaac took from his brother Andrew a conveyance of all his right, title and interest in the said lots of land, and, being thus in a position to represent the whole of the outstanding title, he exhibited, in the court of chancery, a bill of complaint against John, attacking the conveyances made by Noah, the father, to him, upon the ground that they were without consideration and obtained by fraud and undue influence. It was contended that the father, who was old, was without the mental capacity to transact business; that there was no delivery of the deeds to John; that the conveyances were without lawful consideration, and that they were obtained by John's undue influence over his father.

The adoption of these views by the court of chancery led to a decree annulling the conveyances and setting them aside.

The defendant's appeal brings the case before this court upon bill, answer and proofs.

There is nothing in the proofs to warrant the assumption that Noah Collins was lacking in mental capacity at the time of the execution of the conveyances in question. The testimony of the complainant and his witnesses, when confined to matters of fact, shows that the man was old, and that he had long been ailing with malaria, but fails to point to a single occurrence or circumstance upon which to rest a belief that he was impaired in his mental capacity. He continued to work about, he read the papers and the Bible, until attacked by an acute pneumonia, which carried him off after less than a week's illness. The testimony of the medical witness who attended him is utterly void of weight. After saying that he does not remember what was the matter with the old man, or how his examination resulted, or what he treated him for, or what he gave him, or whether he prescribed for him at all, and, after admitting flatly that he does not recollect what the mental condition of his patient was, he ventures the opinion that he was incapable of attending to business at that time. Inasmuch as the witness had just stated that

Collins *v.* Collins.

he had no recollection of his patient's mental condition, that cause of incapacity, at least, is eliminated from his testimony, leaving the physical condition, which led to the calling in of the physician, as the only rational basis for the opinion expressed.

The other witness, called to prove incapacity, proved altogether too much. He testified that he had not seen Noah Collins for eight months before his death (the only period in controversy), but that, for ten years previous, he had had no capacity to attend to business, covering, thereby, a period during which the defendant, John, had no dealings with his father, while the complainant and his other brother had dealt with him as if he was amply able to take care of himself. On the other hand, the testimony of those who saw him down to the time of his death, including the officer who took his acknowledgment, shows the grantor to have been simply a feeble old man, working a little, resting a good deal, complaining of physical ailments, attributed by the family to malaria, but in no sense imbecile or lacking in his ordinary faculties.

If we again turn to the proofs for evidence of undue influence, we find a state of things singularly at variance with such a notion. Noah had been living with his other sons. John did not seek out his father or endeavor to subject him to his influence; on the contrary, the father sought out this son, hoping to find in his home an asylum denied him by his other sons, who had acquired from him substantial financial benefits. The relations between the defendant and his father, from this time on, are devoid of any of the *indicia* of undue influence. There is no suggestion of cajolery, pretended solicitude, or of any of the ordinary artifices or practices by which undue influence is accustomed to be exerted. So far is the contrary true, that the son, upon his father's advent, informed him, with almost impious candor, that he must use his own property for his maintenance and cannot "live off" of him, or, as the complainant's witnesses express it, he told his father, "You can either fish or cut bait—sign them papers or go out of doors, for I won't keep you while you've got property."

We are not called upon to express any opinion as to the standard of filial conduct here displayed, suffice it to say, that no presumption of undue influence should rest upon the fact of family relationship in view of such language—more brutal frankness could not have existed between total strangers. The mere fact of kinship does not raise a presumption of undue influence; it is only a link in the chain, and may be rebutted by the other facts in the case.

The father appears to have accepted the proposition thus roughly laid before him, for he forthwith took up his residence with John, and the deeds were soon afterwards prepared, although they were not acknowledged until the week of final illness, some four months later.

The relationship out of which undue influence can be presumed not having been shown, there must be some direct proof of fraud in order to set aside the conveyances. It is said that such proof is to be inferred from the gross inadequacy of the consideration for the conveyances. Apart, however, from the circumstance that mere inadequacy, unconnected with fraud, will not induce a court to set aside a deed, the consideration, in the present case, was not grossly inadequate. The grantor did not, it is true, live long enough to swell the cost of the property up to the valuation put on it by the complainant's witnesses; but that is not the test. The consideration must be judged as of the time the bargain was made, when its ultimate amount was problematic, not after death has liquidated it. The services bargained for were rendered down to the time fixed, not only by the parties themselves, but beyond which, from their nature, they could not extend; the consideration is a valuable one, and will be upheld at law. The fact that by the death of the father the actual expense incurred by the son does not equal the true value of the property conveyed, is without significance, in the absence of fraud.

Moreover, the complainant has slept on his rights for seven years, a clear case of laches, especially in view of the fact that the claim against the father's estate, which John would otherwise have had, is now barred by the statute of limitations.

The contention, that the deeds will be presumed not to have been delivered, is contrary to the rule of law and opposed to the presumption of fact. The deeds had been prepared and signed; the old man was ill enough to cause a doctor to be sent for; a few days afterward, and before he is again taken down, an officer is procured to take his acknowledgment, and then the final act necessary only for the purposes of record and proof is added. It will not be presumed that this was done without a purpose, and no purpose that does not include delivery will satisfy the presumption.

Fraud not having been shown in the transaction, and there being no circumstances to throw upon the appellant a burden of proof which the testimony does not sustain, the conveyances should stand, and the decree be reversed.

*Decree reversed.*

*For affirmance*—DIXON, MAGIE, REED, COLE, SMITH—5.

*For reversal*— THE CHIEF-JUSTICE, DEPUE, GARRISON, SCUDDER, VAN SYCKEL, BROWN, CLEMENT, MCGREGOR, WHITAKER—9.