[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 448 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 449 
When young "Jimmie" Brennan arrived in the United States from Ireland in 1925, he found a kind-hearted friend and sympathetic benefactor in one George Foley. It was Foley who obtained lodgings for him and soon procured for him an opportunity of employment. Thus originated an affectionate and enduring friendship between the childless George Foley, his wife Catherine, and the grateful James Brennan. Jimmie, however, never was a member of the Foley household.
The succeeding events about to be related occurred in the City of Trenton. Jimmie was engaged in the capacity of building custodian and maintenance supervisor at Rider College, and was thereafter employed in a like position by the Board of Education of the city.
It was in 1938 that Foley unfortunately resolved to enter into the retail alcoholic beverage business, and he purchased an existing saloon for $800. He soon began to succumb to the ever present temptation to indulge in the stock at hand, and his submission was progressively more excessive. His carelessness kept pace with his intemperance. The bar room degenerated into a filthy, squalid resort regularly harboring *Page 450 
that variety of inmates commonly called "bar flies" who are alert to accept any "given" quantity of liquor to which the proprietor or some liberal patron may treat them. Mrs. Foley was aware of the conditions, so was Jimmie, and in his infrequent sober moments so was George Foley.
It was in such exigency that Mr. and Mrs. Foley implored Jimmie to render assistance. Would he not conduct the saloon during some of the evenings of the week, particularly on those when Mr. Foley was incapacitated?
Jimmie had married, and his wife although emphatic in her disapproval, nevertheless appreciated the depth of her husband's gratitude and friendship for Mr. Foley. Jimmie contributed his assistance on such occasions and evidently succeeded in so far as his time and the conditions would permit in improving the surroundings and the environment. Mr. Foley offered him a partnership interest in the business which Jimmie declined.
On December 13, 1944, Foley collapsed and died in the saloon. It was Jimmie who conducted his old friend to an abode of eternal rest.
The only property known to belong to the decedent's estate were the saloon business and its bad will. Mrs. Foley had some information of the existence of an insurance policy on her husband's life, only to discover that he had materially reduced the benefit by means of loans on its security. The apprehension that Mr. Foley had numerous debts and that his estate was insolvent promptly became a reality.
Doubtless Mrs. Foley in looking toward the future envisioned a scene of perplexity. However, I am persuaded that she thoughtfully surveyed all of her circumstances and perceived the avenues which she might possibly pursue. Of her mental ability to have done so, I have no uncertainty.
The scope of her contemplations can be easily deduced from the evidence. She undoubtedly realized that she had no more than $1,500 in cash, that she owned premises at No. 797 East State Street of a taxable valuation of $3,600, upon which there was a mortgage encumbrance of $3,000, and from which premises she derived a relatively small rental income, and that she *Page 451 
had title to the building known as No. 803 East State Street, which was in such a state of disrepair as to be undesirable for occupancy. She had expressed her intention to abandon her ownership of the last mentioned property and to permit it to be sold for unpaid taxes. It was, however, adjacent to No. 805, in which the saloon business was conducted. She learned that she could sell the saloon business by the acceptance of offers ranging from $1,500 to $2,300. She entertained the notion that she herself could continue the business if Jimmie would only assist her, and yet she wondered whether the creditors would continue to supply her with liquors on credit. She had no relatives who could aid her and no source from which to acquire additional capital. I infer that to embark on a project so unsuitable to a woman alone was not alluring to Mrs. Foley.
Naturally her anxiety concerning her future means of livelihood was predominant. Manifestly, the saloon business was the only available fountain from which she could draw any persistent assurance of her prospective maintenance. I believe she adequately appraised the advantages and disadvantages of the available adventures.
A calculating, fair, and mutually prudent bargain between Mrs. Foley and Jimmie seems to have eventuated which did not impair the comfort of Mrs. Foley but, it is said, has unlawfully prejudiced the rights and expectations of her next of kin, most of whom reside in Ireland.
The agreement was of the following tenor: Jimmie would resign his usual employment. Mrs. Foley would assign the liquor license to him and convey to him the building at No. 803 East State Street, which premises Jimmie at his expense would suitably renovate and reconstruct for use as a cafe and to which the license would be then transferred. The upper floors would provide an apartment for the exclusive use of Mrs. Foley and additional rooms which Mrs. Foley could let to lodgers. It was covenanted that Jimmie would furnish the apartment and defray from the business or personally the living expenses of Mrs. Foley. Those benefits Mrs. Foley would enjoy for the remainder of her life. Obviously her acts were not to be without beneficial considerations. *Page 452 
The compact was fulfilled by the parties in every particular. The property was renovated at an expense which apparently exhausted the savings of Jimmie and his wife. The creditors of the deceased were paid. The conveyance and the assignment of the license were executed in the spring of 1945. Mrs. Foley told Mrs. Moore, the alcoholic beverage inspector, "I have everything I want; I am happy." The agreement continued as contemplated until the death of Mrs. Foley on July 7, 1946.
I do not hesitate to acknowledge that I have reposed confidence in the testimony of Mrs. Edith Moore in all respects. In my judgment she was a disinterested, impartial, intelligent, and truthful witness.
With this prefatory statement, I may now state my conclusions concerning the factual elements essential to the establishment of the alleged cause of action. I find that Mrs. Foley had the mental capacity to make the deed and assignment of the license. She had at that time the ability to understand, in a reasonable manner, the nature and effect of her acts and the significance of the transaction in which she was participating. Earle v. Norfolkand New Brunswick Hosiery Co., 36 N.J. Eq. 188, affirmed37 N.J. Eq. 315; Wilkinson v. Sherman, 45 N.J. Eq. 413,18 Atl. 228, affirmed 47 N.J. Eq. 324, 21 Atl. 955; Soper v.Cisco, 85 N.J. Eq. 165, 169, 95 Atl. 1016; Turner v. Cole,116 N.J. Eq. 368, 173 Atl. 613, affirmed 118 N.J. Eq. 497, 179 Atl. 113; Wolf v. Palisades Trust and Guaranty Co.,121 N.J. Eq. 385, 190 N.J. Eq. 94; Campana v. Angelini,132 N.J. Eq. 285, 28 Atl. (2d) 223. The charge of mental incapacity encountered refutation in the testimony of the plaintiffs' witnesses Cottrell and attorney Rigby, and in that of the defendants' witnesses, Doctors Denelsbeck and Beyer, Mrs. Edith Moore, and others.
It must be realized that even a deed or transfer of gift is not necessarily void or in all circumstances voidable. Generally stated, the law permits anyone uninfluenced by fraud or imposition to dispose of his or her property gratuitously, provided the rights of creditors are not thereby injuriously affected, regardless of the providence or improvidence of the *Page 453 
act. James v. Aller, 68 N.J. Eq. 666, 62 Atl. 427; Fretzv. Roth, 70 N.J. Eq. 764, 64 Atl. 152; Kerlin v. Maher,139 N.J. Eq. 566, 52 Atl. (2d) 767.
The parties to the transaction here implicated were not relatives. They were not attached by any fiduciary relationship of a legal nature. There are well established principles which are to be applied in respect of transactions between persons occupying relations in which trust and confidence actually or presumptively exist. I have heretofore collated the decisions exemplifying those principles in my opinions in Campana v.Angelini, supra; Alpaugh v. Alpaugh, 135 N.J. Eq. 200,37 Atl. (2d) 825.
The crucial point in the present case appertains to the quality and character of the relationship existing between Mrs. Foley and Brennan at the time of the negotiations and the consummation of the transaction. The determination of that element is of decisive importance because it is not made evident that in entering into the compact Mrs. Foley had the benefit of independent, competent, and impartial advice. I have in mind our decisions in Peppler v.Roffe, 122 N.J. Eq. 510, 194 Atl. 548; Croker v. Clegg,123 N.J. Eq. 332, 197 Atl. 13; Chandler v. Hardgrove,124 N.J. Eq. 516, 2 Atl. (2d) 661; Zaveski v. Kish,138 N.J. Eq. 61, 46 Atl. (2d) 665; Miller v. Miller, 138 N.J. Eq. 225, 47 Atl. (2d) 32; Kerlin v. Maher, 139 N.J. Eq. 566,52 Atl. (2d) 767.
One cannot always precisely delimit and demarcate a mutually friendly, respectful, and trustworthy relationship from the so-called dominant confidential relationship from which a factual presumption of undue influence legally springs. Tersely stated, the test is whether the relations between the parties were of such a character of trust and confidence as to render it reasonably certain that the one party occupied a dominant position over the other and that consequently they did not deal on terms and conditions of equality. The burden of proving the existence of such a confidential relationship rests upon the party who asserts it.
I acknowledge that the question here is a sharp one, rendered the more acute by the absence of any testimony by *Page 454 
the attorney before whom the instruments of transfer were executed by Mrs. Foley. Yet it is my conviction that Jimmie did not indulge in any deception or exert any actual undue influence upon Mrs. Foley in the transaction to which this litigation relates. I am more disposed to believe that he was drawn into it in deference to his grateful devotion to Mr. and Mrs. Foley which had endured notwithstanding the accumulating misfortunes and adversities sustained by his old-time friends.
It is said that Jimmie was the one to whom Mrs. Foley would naturally appeal for aid. Such, I suppose, is likewise the position of the banker in his relation to the borrower. The testimony quite conclusively demonstrates by its narrative of her normal deportment that in 1945 Mrs. Foley was not a meek and supine person, easily cajoled. At that time she frequently conducted the bar and often participated in card games with patrons and friends in the saloon.
And so I am constrained to conclude that the relations between Mrs. Foley and the defendant Brennan were not in fact such as to generate presumptively that dominance on the part of Brennan which is implicit in undue influence.
If the requisite confidential relationship out of which undue influence can be presumed is not evidentially shown, there must be some proof of actual fraud in order to nullify the transfers.Collins v. Collins, 45 N.J. Eq. 813, 820, 18 Atl. 860. In the absence of both classes of proof, the lack of independent advice is not material. Dill v. Dill, 118 N.J. Eq. 374,179 Atl. 370, affirmed 119 N.J. Eq. 467, 183 Atl. 172; In reFulper, 99 N.J. Eq. 293, 132 Atl. 834; Griffiths v.Griffiths, 142 N.J. Eq. 751, 61 Atl. (2d) 249.
I am satisfied that the transactions here sought to be impugned were "well understood" by Mrs. Foley, and in the existing circumstances the bargain in its entirety was prudent and advantageous.
Judgment for the defendants. *Page 455