THE EXECUTORS OF WILLIAM B. HILL, deceased,

*v.*

EDWARD DAY et al.

1. An inquisition *de lunatico inquirendo* simply makes a *prima facie* case.

2. Where there is no reason to suspect fraud, the test, in cases where mental incapacity is charged, is, Did the person whose act is challenged possess sufficient mind to understand, in a reasonable manner, the nature and effect of the act he was doing, or the business he was transacting?

3. A principal's insanity revokes the authority of his agent, except in cases where a consideration has previously been advanced, so that the power has become coupled with an interest; or where a consideration of value is given by a third person trusting to an apparent authority and in ignorance of the principal's incapacity.

On final hearing on bill, answer and proofs taken before a master.

*Mr. Amzi C. McLean*, for complainants.

*Mr. William H. Vredenburgh*, for defendants.

VAN FLEET, V. C.

The complainants seek by this suit to have an assignment of a bond and mortgage, made by their testator, set aside, on the ground of mental incapacity. The assignment was made February 5th, 1878, and William B. Hill, the assignor, was, on the 7th of July, 1879, declared, by an inquisition duly taken, to be

a lunatic, and to have been in the same condition of mental un-soundness for a period of two years antecedent thereto, but with lucid intervals.   The inquisition simply makes a *prima facie* case.   As against the defendants, it was purely an *ex parte* pro-ceeding, and as to them it is not conclusive even as to the point of time when taken; much less can it have that effect against them for the retrospective period of two years.

The mortgage which is the subject of this controversy was made by Edward Day and wife to Theodore F. Purden, about the 1st of April, 1871, and was assigned by Mr. Purden to Mr. Hill August 1st, 1874.   There is evidence tending to show that Mr. Hill, at the time the assignment was executed to him, offered to cancel the mortgage as a gift to Mrs. Day, and that he subsequently refused to receive $100, which Edward Day offered to pay on it.   It seems to be undisputed that Mr. Hill felt a warm friendship for Mrs. Day, and that she was strongly at-tached to him.   Prior to the date of this assignment, Mr. Hill was in the habit of lending Edward Day his credit by endorsing notes for him.   Edward Day swears that on one occasion Mr. Hill said to him that if he could, at any time, use the mortgage in question, he could have it by sending for it, as he had always intended to give it to Mrs. Day.   On the occasion when the assignment in dispute was made, Edward Day did not go to Mr. Hill himself.   He sent his son Charles, a lad then about nine-teen years of age.   Charles says he told Mr. Hill that his father had sent him there to say that Mr. Hill had offered his father the mortgage whenever he needed it, and that his father was now willing to accept it, and had sent him there for it.   Charles fur-ther says that Mr. Hill then called Mrs. Hill, and requested her to get his box containing his papers.   Mrs. Hill admits that she got the box containing her husband's securities, and unlocked it, and gave it to young Day.   An adopted daughter of Mr. Hill says that after the box was given to young Day she saw him writing, but did not see what he was writing, nor does it appear that either she or Mrs. Hill made any inquiry upon that subject. The assignment was written by young Day on the mortgage itself, and was then signed by Mr. Hill, and young Day took the

papers away with him. The assignment was not made to Edward Day, but to his daughter Anna. Both Mrs. Hill and her adopted daughter swear that they believed Mr. Hill, at this time, to be wholly unfit to transact business of any kind. The adopted daughter says that the next day she discovered that the mortgage in question was not in Mr. Hill's box, and so informed her mother. Some time afterwards Mr. and Mrs. Hill went to Tom's River, and after having a talk with some persons at the clerk's office, Mr. Hill determined to demand the return of the mortgage, and authorized his counsel, by writing, to demand its return. When Edward Day was notified that Mr. Hill desired the return of the mortgage, he said, at once, it should be returned. He further stated that soon after getting the mortgage, he had taken it to Philadelphia to have it examined, with a view of pledging it as security for a stock of goods he expected to purchase, but he would go and get it and return it to Mr. Hill. He further says he did get it, and on the 4th of March, 1878, took it to Mr. Hill's residence and offered to return it to him.

As the occurrences of this interview constitute, in my judgment, the pivot on which this case turns, it is necessary that they should be stated in detail. Edward Day is the only witness that describes them. He says:

"I got there about eleven o'clock in the morning; I saw Mr. and Mrs. Hill; they were in the house; I went in, and after inquiring about the health of the family, I stated the object of my visit; I told him there had been considerable talk about the mortgage, but I had got it and brought it back; I then took it from my overcoat pocket—the papers were in a large envelope—and took out each one and laid them on the table, and thanked Mr. Hill for his many acts of kindness, and proposed that he should take the papers back; Mr. Hill replied that the mortgage was just where he had always intended it should be; that it was all right until he got to the clerk's office at Tom's River, and there he was induced to try to get it back; Mrs. Hill acquiesced in what was said; a general conversation then ensued as to the prospect of my being able to make the trade for the stock of goods I had before spoken of; I then stated, as I had stated before, that if I could accomplish the trade and use both mortgages—this one, and the one in New York—I would make money enough to pay Mr. Hill every dollar he had paid for me; Mr. Hill then stated he was willing I should retain the mortgage, and he hoped it would be of use to me. I then said if that was the case, was it not best that he should give me a paper showing that his counsel was not to demand the return

Hill *v.* Day.

of the mortgage, and he replied, 'Yes;' Mrs. Hill then got paper, pen and ink, and I wrote this note, viz.: 'Point Pleasant, Ocean county, N. J., March 4th, 1878. I. W. Carmichael, Esq.: This is to authorize you not to demand of Edward Day any papers now in the possession of Edward Day, and for which I gave you a written order.' I read this paper to Mr. and Mrs. Hill, and Mrs. Hill suggested putting in the date of the note they had given to Mr. Carmichael; I did not show the date; between them they agreed upon the date as February 28th, 1878, and I added it; after I wrote it I read it to both, and Mr. Hill signed it; I then asked Mrs. Hill if she was willing to this, and she said she was, and she signed it too, saying she hoped I would make a good trade, and be able to pay it back."

The facts given in this narrative stand substantially admitted. They describe a transaction at which Mrs. Hill was not only present, but in which she took an important part. She has been examined as a witness in this case, and has had a full opportunity to deny or explain them; if she did not understand or remember them as Edward Day had sworn to them, her interest and her duty required her to deny them; but this she has not done. After he spoke, she kept silent. In this condition of affairs, her silence confirms the truth of his story. There was but one way in which she could have confirmed the truth of his evidence more effectually, and that was by deposing to the same facts.

Now, taking the history of this interview as given by Edward Day to be true, what does it show was the state or condition of Mr. Hill's mind on the 4th of March, 1878 ? Where there is no reason to suspect fraud, the test in this class of cases is, Did the person whose act is challenged possess sufficient mind to understand, in a reasonable manner, the nature and effect of the act he was doing, or the business he was transacting ? He may be old, or enfeebled by disease, or irrational upon some topics, and yet possess sufficient mind to make a valid disposition of his property. In the absence of fraud or imposition, the only question the court is required to consider is, Did the person whose act is challenged clearly understand and comprehend what he was doing when he did it ? *Lozear* v. *Shields, 8 C. E. Gr. 510; Eaton* v. *Eaton, 8 Vr. 113.* It is important to remember that the proceeding in which Mr. Hill was declared to be a person

of unsound mind was not instituted until more than a year had elapsed after this date, and that the inquisition then taken finds that he enjoyed lucid intervals. The evidence taken in this case shows, with almost entire unanimity, that this finding is true. And what is here meant by lucid intervals is not that the darkness which had come upon his mind was lifted merely for a few moments, or a very brief time, so that the return of the light of reason only served to make the darkness which ordinarily covered his mind more painfully conspicuous, but that his mind-power was so completely restored that his mind seemed to be in its normal condition and habit.

Now, what are the important facts of this interview? When the return of the mortgage was offered, Mr. Hill said it was just where he had always intended it should be. As already mentioned, there is evidence showing that when the assignment was made, he offered to cancel the mortgage as a gift to Mrs. Day. Although this purpose was not then carried out, it is shown that he continued to entertain it, for he subsequently refused to receive payments which were offered to him on it, for the same reason. He also said that he was satisfied with the disposition he had made of the mortgage until the conference at the clerk's office at Tom's River, and there he was induced to think that the mortgage should be returned to him. These remarks show a good memory, and clear understanding and judgment. He remembered what he had done, the motives which influenced him, and that his judgment approved his conduct until new influences were brought to bear upon it, and then that his judgment underwent a change, and he wanted the mortgage returned to him. He was then told what use Day desired to make of the mortgage; that he wanted to pledge it, with another mortgage, for the purchase of a stock of goods, and that he felt confident if he could get the goods, at the low price at which they were offered, he would make money enough on them to return to Mr. Hill all the money he had paid for him, and thereupon he voluntarily said that he was willing that Day should retain the mortgage, and expressed a hope that it would prove useful to him. His attention was then directed to the paper he had given his coun-

sel, and he was asked if the authority given by it ought not to be revoked. He at once comprehended the necessity of that step, in order that Day might use the mortgage without interference, and directed that it should be taken.

If this is a truthful picture of Mr. Hill's part in this transaction, and exhibits fully all he said and did, there can be no doubt that he fully and clearly understood the nature and effect of his act when he consented that Day should retain the mortgage. His conduct and speech not only show that he knew what he was doing, but that he was capable of exercising ordinary caution and discretion ; for when his attention was called to the fact that he had given his counsel written authority to demand the return of the mortgage, he saw, at once, that. to enable Mr. Day to use the mortgage as he meant he should, it was necessary that that paper should be revoked, and he accordingly directed its revocation.

But there is another feature of this interview that must not escape attention. Day had been required to return the mortgage under an accusation that he had obtained it fraudulently. The bill charges—and there is little evidence tending to show that the charge is true—that the mortgage was originally obtained under a representation that it should be delivered to Mr. Hill's counsel. Mrs. Hill had been more active and prominent in the efforts made to secure the return of the mortgage than her husband. The mortgage is now returned, and the fraud-doer is not only before Mr. Hill, but also before Mrs. Hill. There is no question about her capacity. If the mortgage had been procured secretly, or by any kind of deceit or falsehood, Day would not only have been a suspected person in her opinion, but she would already have condemned him as a dishonest man. She would naturally distrust and dread him, and would almost involuntarily repel any effort he might make to win her confidence. This would be especially so if she believed that her husband was mentally incompetent to take care of himself, and that Day had already taken advantage of his weakness. She was chiefly responsible for Day's getting possession of the mortgage originally, and now that it is again within her reach, and she has an oppor-

tunity to remedy the wrong which she had carelessly committed, she would naturally be extremely cautious and wary. But she is not so. She hears her husband say that the mortgage is just where he always intended it should be, without once reminding him that it had been obtained from him by deceit; and when Day asks her if she is willing that he should retain the mortgage, she answers Yes, and expresses the hope that he may make a good trade, without uttering the slightest insinuation, even, that his conduct in the matter had been characterized by anything like deceit, or any sort of over-reaching or imposition.

Cotemporaneous conduct or demeanor, constituting part of the transaction brought under review, is always entitled to very grave consideration in cases of this kind. It generally portrays much more truthfully what a witness understood, thought or believed, at the moment, than words subsequently spoken, even when they are uttered under the sanction of an oath. Looking at Mrs. Hill's conduct, as it is described by the evidence—seeing her get her husband's strong box and deliver it, unlocked, to young Day, in the presence of her husband, and then leaving them, and thus giving young Day full liberty to handle, at his will, all her husband's securities, and then seeing her subsequently, with her husband and the elder Day, discussing the question whether Day should be allowed to retain the mortgage which she had accused him of having obtained surreptitiously, and actually consenting to, and taking part in, the execution of a paper by which his right to use the mortgage for his own purpose was made stronger than it was before—I confess I find it impossible to believe that up to that time she had the least doubt that her husband possessed full capacity to transact any ordinary business, and to form a prudent and sensible judgment respecting ordinary business affairs.

The evidence, in my opinion, demonstrates very satisfactorily that Mr. William B. Hill, on the 4th of March, 1878, when he gave Edward Day authority to pledge this mortgage for the purchase of a stock of goods, possessed sufficient mind to clearly understand what he was doing, and shows, with equal clearness, that he consented to such use being made of the mortgage freely,

Hill *v.* Day.

and without the practice of any sort of fraud or imposition.

The authority to pledge the mortgage was given March 4th, 1878, but was not exercised until May 28th, 1878, that being the date of the assignment by Anna Day to the defendant Joseph E. Smaltz. A period of nearly three months elapsed between the date when the authority was given and the time when it was exercised. During this period no attempt was made to recall the authority, nor does any question seem to have been started as to Mr. Hill's competency to manage his affairs. I have not examined the evidence with a view of ascertaining what it shows respecting the condition of Mr. Hill's mind during this period. In view of a recent judgment of the court of errors and appeals, such examination could serve no useful purpose. That tribunal has lately declared that where a principal becomes insane after appointing an agent, the principal's insanity operates, *per se,* as a revocation or suspension of the agent's authority, except in cases where a consideration has previously been advanced in the transaction which was the subject-matter of the agency, so that the power has become coupled with an interest; or where a consideration of value is given by a third person, trusting to an apparent authority, and in ignorance of the principal's incapacity. *Matthiesen Refining Co.* v. *McMahon, 9 Vr. 546.* The evidence renders it entirely clear that the defendant who now holds the mortgage gave a consideration of value for it, and that when he accepted it, he was not only ignorant that Mr. Hill's capacity had ever been doubted or questioned, but that no facts or circumstances had ever come to his knowledge, respecting Mr. Hill's mental condition, which should have provoked a prudent man to make inquiry. My conclusion is, that the defendant Smaltz holds the mortgage by a valid title.

The only question which remains is, for what sum is he entitled to hold it? Day was authorized to pledge it for a stock of goods. There was no limitation as to amount. So far as appears, there does not seem to have been any negotiation or talk upon that subject. The inference to be drawn from Mr. Hill's expressions would seem to indicate quite forcibly that he

did not intend to impose any restrictions as to time, amount or persons. He said that the mortgage was just where he always intended it should be, and that he was willing that Day should retain it, and hoped that it would be of use to him. It would seem scarcely possible, under this language, to make any use of the mortgage for the purchase of goods which could be regarded as a misappropriation of it. In my judgment, the defendant is entitled to hold it for the full amount for which it was pledged to him.

The mortgage was not assigned to Anna Day for her own benefit. Her name was used for the purpose of enabling her father to pledge the mortgage for goods; he was to pay the mortgage. The transfer was not made by way of gift, but simply to enable Day to obtain credit. Hence, when the defendant Smaltz is paid, the complainants are entitled to the mortgage. The complainants may take a decree that, on paying Smaltz the amount due to him, together with his costs, he shall assign the mortgage to them.