MARY A. LEWIS et al., complainants,

*v.*

ALBERT T. HUNT et al., defendants.

[Submitted February 9th, 1923. Decided March 23d, 1923.]

**Conveyances—Setting Aside of Conveyances Made Without Consideration—Deed in Consideration of Love and Affection Valid—Resulting Trusts—Constructive Trusts—Property Held Jointly—Property Held in Severalty.**

On bill, &c.

*Messrs. Autenreith & Gannon* (by *Mr. Joseph F. Autenreith*), for the complainants.

*Messrs. Melosh, Morten & Melosh* (by *Mr. Louis G. Morten*), for the defendants.

BENTLEY, V. C.

This suit involves a bill to set aside a conveyance made by the complainant Mary A. Lewis and her husband to the defendant Albert T. Hunt, and a counter-claim by the said Hunt, wherein Helen V. Luck and her husband are joined as defendants to impress a trust.

One Margaret T. Hunt, wife of the defendant Hunt, died intestate on the 9th day of January, 1921, seized of three pieces of real estate, which will be referred to as the "Halladay street," "Jersey City" and "Bayonne" properties, respectively. The first she held in joint tenancy with her husband and is not involved in this suit. The latter two she held in severalty, and it is the character in which she so held that is to be determined.

She left surviving her as her heirs-at-law the complainant Mary A. Lewis and a granddaughter, the defendant Helen V. Luck, a daughter of a deceased son. She was also survived by the defendant Hunt, who was her second husband, Mrs.

Lewis and Mrs. Luck's father being her children by a former marriage, there having been none as the result of her marriage with the defendant.

The bill, in addition to the foregoing facts, alleges that the complainant Mary A. Lewis was seized of an undivided one-half of the Carteret avenue and Bayonne properties; that shortly after her mother's death Hunt, representing to her that she had no beneficial interest in said lands, requested her to sign a deed of the premises to him, threatening that if she did not do so he would start a suit against her and put her to great expense and costs; that in her ignorance and fear of such consequences she consented thereto, receiving no ·consideration; that subsequently she learned that she was the owner of an undivided one-half interest as aforesaid.

The answer admits that Hunt told Mrs. Lewis that he was the equitable owner, and alleges that she well knew the conditions existing at the time of the execution of the deed mentioned in the bill. The defendant, by way of counter-claim, alleges that shortly after his marriage with Mrs. Hunt, who at that time had an estate of not more than $350, it was agreed between them that he should turn over to her all moneys coming into his hands, whether by way of wages or otherwise, and that such money and all other property should be held in their joint names with the right of survivorship. Mrs. Luck and her husband by this counter-claim were made parties to the suit.

On the final hearing the testimony was violently contradictory and was so voluminous that it would be intolerable to present even a synopsis of it. It presents two main considerations. The first question to be taken up is the effect to be given to the deed from the complainants to the defendant Hunt. The second involves the estate that Mrs. Hunt acquired by the conveyance of the Carteret avenue and Bayonne properties to her.

I am convinced, from the testimony and the comparison of Mrs. Lewis' bill with her testimony at the final hearing, that she has irrevocably parted with any interest she may have had in those parcels of land by her deed to Hunt. It is highly significant that her testimony not only varies from the alle-

gations of her bill, but is absolutely inconsistent therewith. Her bill charges that by fraud and misrepresentation as to her rights in her mother's estate she executed a deed of the property under consideration, and it was rather startling to hear her testify at the final hearing that she did not know she was signing a deed, but was told by the defendant that the paper was "to lift the mortgage" on the Bayonne property. In addition, she swore that when her husband asked the consequence of refusing to sign the deed Mr. Melosh, the solicitor, said: "Then she will have to prove it was not Hunt's money;" this, in connection with her testimony that Mr. Melosh told her that Hunt could go to court and get the property if they didn't sign, indicates clearly that she understood her act. It seems to me, for these reasons, there is no alternative but the dismissal of the bill.

In passing, it may be said that the testimony on both sides indicated that up to this time the complainants and Hunt were living in the greatest amity, and at that time or shortly thereafter Hunt took up his residence with the complainants and lived with them until after the filing of the bill. A deed in consideration of love and affection is valid.

Eliminating the suit of Mrs. Lewis there remains for consideration the rights of Mrs. Luck who, as I have said, stands in the position that her father would if he were living. She has made no conveyance of her estate in the properties under consideration. Her rights are the same to-day that they were upon the death of her grandmother. If the prayer of the defendant's counter-claim against her is to be granted it must, of necessity, be upon the ground that her grandmother held the title as trustee, either under a resulting or a constructive trust, because under the statute no express trust could be proved.

Assuming the truth of all that Hunt says, it is clear that he has not established a resulting trust. It is elementary that where property is purchased by one for a stranger, and the purchase-money is paid by the stranger, and title is taken in the name of the person making the purchase, a trust results. *Cutler* v. *Tuttle, 19 N. J. Eq. 549.* This case is cited with approval by Mr. Justice Swayze, speaking for the court of

errors and appeals, in *Beck* v. *Beck, 78 N. J. Eq. 544* (at *p. 548*) : "But if some of the purchase-money did come from the earnings of Hunt, neither he nor anyone else, now that death has closed the mouth of his former wife, can point out how much. Of course, a complainant cannot come into court and establish a resulting as distinguished from a constructive trust and say that some, he knows not how much, of his money was used in the purchase of land in another's name."

"Where the payment of a part only is claimed, the evidence must show, in the same clear manner, the exact portion of the whole price which was paid." *Pom. Eq. Jur. 1040.*

In the case of *Cutler* v. *Tuttle, supra,* it is said: "There is no doubt that payment of part of the purchase-money will create a resulting trust to the extent of that payment, but the amounts paid by the different parties must be shown with certainty, and the resulting trust will not be held to arise upon payments made in common by one asserting his claim and the grantee in the deed, when the consideration is set forth in the deed as moving solely from the latter, unless satisfactory evidence is offered, exhibiting the portion which was really the property of each, and establishing the fact that the payment was made for some specific part or distinct interest in the estate." *Baker* v. *Vining, 30 Me. 121; Sayre* v. *Townsend, 15 Wend. 647; McGowan* v. *McGowan, 14 Gray 119; 1 Lead. Cas. Eq. 276.*

To the same effect is the opinion in *Thalman* v. *Canon, 24 N. J. Eq. 127* (at *p. 133*), where it is said that there must be clearly established proof of the payment of a definite part of it. To like effect is the case *Parker* v. *Snyder, 31 N. J. Eq. 164; affirmed, 32 N. J. Eq. 827.*

The testimony is clear that in addition to the money the decedent saved from her husband's wages she acquired considerable means through her exertions in maintaining a boarding-house, which became her separate property under the statute (*3 Comp. Stat. p. 3225; Small* v. *Pryor, 69 N. J. Eq. 606*) ; and it is not only impossible under the proofs but would be impossible under any circumstances to definitely allocate the portions of the considerations of these properties which came from her and those which arose from the savings

out of the defendant Hunt's earnings, because while he is able to state with fair accuracy his wages at the various stages of life there is no way, now that his wife is dead, to determine how much she saved out of the wages that he turned over to her.

For these reasons I do not feel that he has succeeded on his counter-claim as to Mrs. Luck under the theory of a resulting trust. I have dealt with the subject of a resulting trust because, although counsel does not contend for one in his brief, yet I feel if Hunt could have established that all or any alloquot part of the purchase price was advanced by him, he will clearly be entitled to a trust *pro tanto*.

This leaves for consideration the question as to whether or not he has established a constructive trust.

Vice-Chancellor Van Fleet, in the leading case of *Midmer* v. *Midmer's Executors, 26 N. J. Eq. 299* (at *p. 304*), says:

"The effort always is, in cases of this class, to overcome and destroy a regular, formal, written title, by showing, by evidence less solemn and trustworthy, that the written instrument itself, that though the deed says the purchase money was paid by A, and the lands were conveyed to him for his own use and benefit, yet, in truth, he did not pay the purchase money, but it was paid by B, and the conveyance was not made to A for his own use and benefit, but to him in trust for B. To make such an effort successful, the law, for the safety of titles, requires that the proof shall be of the most convincing and satisfactory kind. Nothing short of certain, definite, reliable, and convincing proof, will justify the court in divesting one man of title to lands, evidenced by a regular deed, and putting it in another. *Cutler* v. *Tuttle, 4 C. E. Gr. 560; Boyd* v. *McLean, 1 Johns. Ch. 582; Lench* v. *Lench, 10 Ves. 517.*"

This language has been approved by the court of errors and appeals on many occasions, with regard to the proof requisite to establish a trust, and the reason for the burden is so apparent that it would be a waste of time to discuss it any further.

In the case at bar the defendant Hunt rests his claim upon his testimony as to the agreement with his wife, corroborated

by the testimony of the witnesses Meader and Silverstein. The former, a carpenter, swears that he was employed by Mrs. Hunt to do some work upon her Bayonne house in the summer of 1918, when he was assisted by Hunt; that in the evening Mrs. Hunt prepared supper for them, and that while talking during or after the meal there was discussed a contest over the estate of a former neighbor of Hunt's before his family moved to Bayonne named Kaiser; and that Mrs. Hunt, *a propos* of that subject, said that there would be no contest over the Hunt property because it was held jointly by them and would go to the survivor. This witness did not appear to have a good memory and was unable to recollect many of the surrounding circumstances of this conversation when cross-examined.

Silverstein testified that he and Hunt were members of the auditing committee of their lodge, and that twice he had heard Mrs. Hunt make similar statements, once in the year 1915 in talking about the Carteret avenue purchase and again in 1917 when talking about the litigation over the Kaiser estate. He was also at a loss to recall any of the surrounding circumstances. He said that Hunt had spoken to him about his testimony after the death of Mrs. Hunt.

Does this proof measure up to the standard laid down in the *Midmer Case?* I feel that it does not. Frailty of human memory, coupled with the friendship of the witnesses for Hunt, lead me to believe that, in all honesty and sincerity, they form but a slender support for an argument that is designed to break the effect of a rule of the greatest importance. In addition, there is the strange slumbering of Hunt during all the years that he lived on terms of the greatest intimacy with his wife and in apparent amity. These properties, with the exception of a bank account the existence of which was unknown to Hunt, constituted all the property that he and his wife had acquired. It seems incredible that over a period of ten years tax bills and receipts, water bills and receipts, insurance policies, and other documents, could have gone in and out of the home without his being aware of the true condition of the title of the properties involved. While he swears that he did not even attend to the passing

of title, it is evident that the loans on the purchase-money mortgages were not made without his joining in those instruments and, probably, the bonds they were designed to secure. It is incredible that this cool, intelligent and observant man could have failed in all the transactions concerning these properties, over all those years, to have had any inkling of the true state of affairs. At least, there is an abiding doubt sufficient to invoke the rule in *Midmer* v. *Midmer's Executors, supra.*

In this state of the proofs, this man asks that this court brand with fraud the woman with whom he lived until the time of her death. It seems to me that to do so would render insecure the title to all property after the owner should, by reason of death, no longer be present to answer the charges made against him. The wisdom of the rule laid down by Vice-Chancellor Van Fleet bars the counter-claimant from the relief he seeks.

It is argued in behalf of the complainants that if the defendant Hunt has failed to establish the allegations of his counter-claim it necessarily follows that the complainants have made out their bill. I think not, because while the proofs of that do fall short of what is required under the rule in this state, yet I do not believe that there was any fraud or misrepresentation practiced as against the complainants. I believe that Hunt told his stepdaughter what he actually believed to be true, and that for some reason she freely and voluntarily relinquished her rights. Whether it was in consideration of the affection that existed at that time between her and Hunt, or because of some promise made to him at the time, or the natural hope that a willing compliance with his request might cause him to reciprocate by devising the property to her I do not know, nor is it necessary to decide. The fact is that she knew she was executing a deed to him and she did it without any such fraud upon his part as would vitiate the instrument.

I will advise a decree in accordance with the foregoing views.