Joseph R. Johnson was the son of Josiah B. Johnson and Mary Turner Johnson, who was Josiah's second wife. On the death of Josiah, he left him surviving his widow, his son Joseph and a son Benjamin F. Johnson, by the former wife.
Josiah B. Johnson died testate and by his will devised all of his property, real, personal or mixed, with a minor exception, to his wife, Mary Turner Johnson, and son, Joseph R. Johnson, the wife and Joseph "to hold and use said property in common until Joseph should attain his majority and then to be equally divided between them, the wife to have and enjoy her portion during her natural life and widowhood, and in case of her death or remarriage, her portion to be divided equally between the sons and half brothers, Benjamin F. and Joseph R. Johnson."
The property so devised by Josiah consisted of two tracts of land on the east side of Ohio avenue and a tract having a frontage on Atlantic avenue, beginning at the southwest corner of Ohio and Atlantic avenues, one hundred and twenty-five feet on Atlantic avenue by one hundred feet in depth.
After the death of Josiah, and on January 23d 1894, Joseph R. Johnson, by quit-claim deed, conveyed to his mother, for life, one of the lots on the east side of Ohio avenue, fifty by one hundred and fifty feet, and the westerly fifty feet of the Atlantic avenue property, and on the same day, the mother, by quit-claim deed, conveyed to Joseph her interest in the other lot on the easterly side of Ohio avenue and seventy-five by one hundred feet at the southwest corner of Ohio and Atlantic avenues.
The above conveyances were executed at a time when Joseph was approximately twenty-one years and three months of age, Joseph having been born on October 1st, 1872. *Page 371 
The conveyances between the mother and son were evidently made with the intention of carrying out the terms of the will of the father, Josiah B. Johnson.
On February 24th, 1894, Joseph, by deed of special warranty, conveyed to his mother, Mary Turner Johnson, all of his right, title and interest in all of the property which he took by virtue of the will of his father and which Mary Turner Johnson had quit-claimed by deed of January 23d 1894, and also including the farm in Galloway township, of which property Joseph became seized by deed from the executors of his father's estate, and a quit-claim deed from Benjamin F. Johnson.
On July 25th, 1900, Joseph conveyed to his mother other lands of which he was then seized and of which he had become possessed other than through the will of his father.
In addition to the real estate of which the mother of Joseph became seized by virtue of the conveyances above recited, she was the owner of other properties which she had purchased and of which she had become such owner through others than her son.
The mother died on the 25th day of November, 1900, testate, and by her last will and testament devised all of her real estate holdings to her son, Joseph, absolutely.
After the death of the mother, and on the 2d day of January, 1901, Joseph purchased from his half brother, Benjamin F. Johnson, the one-quarter interest of Benjamin in the Ohio avenue property and the Ohio and Atlantic avenues property, which one-quarter interest Benjamin had inherited from his father, as above recited.
On April 5th, 1901, Joseph was adjudicated a lunatic and at the time of his adjudication, and prior thereto, had been committed to the New Jersey State Insane Asylum.
The Atlantic Safe Deposit and Trust Company was appointed guardian of the person and estate of Joseph and continued as such up until the time of its merger with the Guarantee Trust Company, which company continued as guardian. *Page 372 
During the continuation of the guardianship, most, if not all, of the real estate of which Joseph was seized and possessed, was sold, and it is admitted that so much of the property or securities held by the guardian of Joseph, which represents the proceeds from the sale of the real estate of the lunatic, and accumulations thereof since his death, descends to those heirs of the lunatic who would have received the real estate had it not been converted. See 2 Comp. Stat. p. 2788 § 9.
Joseph never regained his sanity and died on February 23d 1933, testate. A caveat was filed against the probate of Joseph's will and such proceedings were had thereon that probate was refused in the orphans court of Atlantic county, which refusal was affirmed in the prerogative court. In re Johnson, 115 N.J. Eq. 249.
Joseph left him surviving, as next of kin, on his father's side of the family, a son and daughter of Benjamin F. Johnson, and on his mother's side of the family, thirteen relatives of equal degree, first cousins.
These first cousins of the mother's blood, either as complainants or defendants, allege that as such, under the laws of descent, they inherit all of the lands of which Joseph was seized at the time of his death, of which he became seized by virtue of the will of his mother, and concede that real estate other than that devised by his mother descends to the niece and nephew, Vincent Jerome Johnson and May Wilson, defendants herein.
The defendants Vincent Jerome Johnson and May Wilson admit that under 2 Comp. Stat. p. 1919 § 5 and 2 Comp. Stat. p. 939 §6, under ordinary circumstances, the real estate which Joseph obtained by the will of his mother would descend to his heirs-at-law who are of the blood of his mother, and that so much of the assets in the possession of the guardian of Joseph as represent the investment of moneys received from the sale of such real estate would likewise descend to his heirs who are of the blood of his mother, but they allege that the conveyance by Joseph to his mother of February 24th, 1894, as well as that of July, 1900, did not *Page 373 
vest the mother with the property therein described because, they say: "Joseph Johnson was mentally incompetent and that there was a relationship of trust and confidence existing as between Joseph and his mother, so that he was entirely under her control and influence, as a result of which she caused him to make the conveyances referred to, for her own benefit, without any consideration and without independent advice to him, as a result of which he was entirely deprived of his property and that, therefore, she became the trustee of said property for the benefit of the said Joseph R. Johnson."
This defense is raised by the answer and affirmative defenses set forth therein, and is averred in the counter-claim under which defendants pray that the deed of February 24th, 1894, and July 2d 1900, be construed to make the mother the trustee for Joseph, "and that it should be adjudged and decreed that Mary Turner Johnson had no interest in the premises so involved in this litigation."
By an amendment to the answer, it is alleged that Joseph R. Johnson, after becoming vested, according to the record, with the entire title to premises situate on Ohio avenue and Ohio and Atlantic avenues, executed a mortgage covering all of that property to Benjamin F. Johnson, and that he later defaulted under the terms of the mortgage by failing to pay the taxes within the time stipulated in the mortgage, which failure to pay was a default under the terms and conditions of the mortgage and thereby destroyed all rights of those in the blood of the mother to that property, of which defense more hereafter.
The conflicting interests which are before me are, therefore, the Turner line of descent through the mother, and the Johnson line through the father, and they will be so referred to hereafter, irrespective of their position as complainants or defendants.
Going back to the defense first above quoted (mental incapacity and undue influence), if defendants' contention is correct, then the Turner branch of the family do not take through the mother's blood, as she, being trustee for Joseph, could not devise to him that which he already owned, and *Page 374 
Vincent Jerome Johnson and May Wilson take through the Johnson line.
The first question is — Was Joseph, on February 24th, 1894, mentally competent to execute a valid conveyance to his mother? We start out with the proposition that normal state of mind of every person is presumed sane until the contrary is shown (Boylan v. Meeker, 28 N.J. Law 274), and that the burden of proving insanity is on the defendants, who allege it. Den, exdem. Trumbull, v. Gibbons, 22 N.J. Law 117; Whitenack v.Stryker, 2 N.J. Eq. 8, 11; In re DeRemer, 41 N.J.L.J. 344.
What is the test of capacity to make a deed?
"The test of mental capacity to make a deed is whether he possessed sufficient mind to understand, in a reasonable manner, the nature and effect of the act he was engaged in." Wilkinson
v. Sherman, 45 N.J. Eq. 413, and to like effect, see Waldron
v. Angleman, 71 N.J. Law 166, 168; Hill v. Day, 34 N.J. Eq. 150; Davren v. White, 42 N.J. Eq. 569, 572; McCambridge v.Daly, 109 N.J. Eq. 43; Pom. Eq. ¶ 948 note 2; Kern v. Kern,51 N.J. Eq. 574, 579.
I deem it necessary to analyze the testimony, pro and con, on this important question.
Mrs. Wilson, one of the defendants, and vitally interested in the outcome of this litigation, was born in June of 1885 and in February of 1894 was approximately eight and one-half years of age, and in the summer of 1894 lived at the home of Joseph's mother, where Joseph also dwelt. Mrs. Wilson also lived there a part of the two succeeding summers. She testified that the mother constantly called her son "Dodo," thereby indicating that she treated him as a little boy; that she doled out spending money in items of five and ten cents, although Joseph was then of age; that she would ask him to do things and if he sulked she would say, "Is that nice, Dodo?"; that he would sit for periods of time as if in a study and not talk and then would suddenly get up and pace the floor; that his mother would lock him in his room and order that he be not disturbed and would take coffee up to him; that in the summer of 1895 Joseph went *Page 375 
to Benjamin F. Johnson's farm in Chestnut Neck, where Mrs. Wilson was hoeing, and that Joseph took the hoe from her and up-rooted the growing vegetables; that at one time he said that everybody was going crazy and that he was going to sell out and move; that Joseph had no pleasures and that when a frequent girl visitor to his home would come in, Joseph would go out; that in the summer of 1894 he had said that he was going to give everything to a colored church.
The testimony of this witness must be scrutinized carefully, inasmuch as it is a recital in 1934 of impressions made on the mind of a child not yet nine years old in 1894. Forty years have elapsed, and in 1901 Joseph was declared a lunatic, so that those things which occurred in the witness' infancy may possibly have been magnified in her mind by the subsequent event of lunacy.
Mr. Heck, a cake baker, first knew Joseph in 1892 and in 1893 they talked about a partnership and actually opened up a partnership business in February of 1894. Heck went to live at the Johnson home in November of 1893 and he says that at some time, probably after the formation of the partnership, he heard Mrs. Johnson say that she was going to have Joseph's property conveyed to her and that she would return it; that he paid the first two months' rent to Joseph and after that to Joseph's mother; that after the formation of the partnership, Joseph went to Philadelphia, probably in April of 1894, and did not come back until June of 1894; that the mother called Joseph "Dodo;" that Heck and Joseph bought a delivery wagon which the mother complained about by reason of the price paid for it; that after the dissolution of the partnership the mother doled out money in small amounts to Joseph.
The impression which the testimony of this witness was intended to convey was that the mother was the dominating influence and that she controlled the son and his business affairs, and that Joseph was not stable, as indicated by his Philadelphia trip; that the mother took charge of all the finances; that the mother intended to have Joseph's real estate conveyed to herself so that he could not dissipate it. *Page 376 
John B. Sooy, a man employed by Benjamin F. Johnson, and who lived a half mile from Benjamin's farm, knew Joseph at the age of nine years, and says that Joseph did not play like other boys; that on being asked questions he would suddenly leave during the conversation; that Mrs. Johnson and Joseph came over to the farm sometime during 1894 and that after dinner Benjamin Johnson said that he was worried about Joseph's property and that the mother said, "I have it and I will give it to Joseph when I die;" that Joseph frequently said, "Get all you can and pay no bills."
William Sooy knew Joseph from infancy, up to his fifteenth year, and says that Joseph had a peculiar laugh; that he did not play like other boys; that after Joseph's return from the asylum he noticed the same peculiar laugh.
Mark Loveland knew Joseph all his life and says that he played with him as a boy; that he would laugh at nothing; that while playing baseball as a boy, he would quit the game suddenly, and that one time he turned his coat inside out and went to a chicken coop and pretended to go to roost, as a chicken would; that he frequently invited Joseph to go fishing and that Joseph's reply would be that he would have to ask his mother.
Mr. Weeks knew Joseph when he was about eighteen years old and noticed his peculiar laugh; that on one occasion Joseph suggested that the witness go with him on a "tear" to Chicago, and said that he was going to make the witness wealthy; that he also said he could, on foot, beat a horse to Atlantic City, or an express train.
Mr. Endicott, a boatman, saw Joseph two or three times each summer as Joseph would walk from Atlantic City to Chestnut Neck; that he would stop at the boat on which Mr. Endicott was working, and that he prophesied flying ships.
Miss Freas says that Joseph was confused when he stopped at her office and that he repeated the Lord's Prayer, but she is very indefinite as to her dates.
Mrs. Young lived next door to Joseph in 1895 and knew him six or seven years before 1896; that he was a peculiar acting child; that there was a fence around the house and *Page 377 
that Joseph would run around and around the confines thereof, and that his mother would tell him to come in because people would think he was crazy; that he repeatedly asked the witness, after the death of his mother, whether he had "put her away right;" that he burned his mother's wearing apparel in the yard after her death; that he would sit in the house with the window shades down and look under them and make faces at the children. This was about thirty-eight years ago, she said.
This, in general, is the sum total of the evidence offered by the defendants to show the lack of mentality of Joseph, and complainants offered, on their part, the evidence of other people who had associated with Joseph and done business with him from his youth on up until the time of his being declared a lunatic.
Judge Cole took the acknowledgment to the deed of January 23d 1894, as well as to one of October 19th, 1894, and also to an agreement of sale between Benjamin and Joseph on December 24th, 1900, and also to the mortgage given by Joseph to Benjamin on the transfer of the Ohio avenue property, and saw Joseph on frequent occasions, and his statement was that he always thought Joseph perfectly sane and that there was never anything in his conduct to arouse any suspicions to the contrary, until the incidents leading up to the lunacy commission in 1901.
Joseph volunteered for the Spanish-American War, enlisting in the Atlantic City unit, and Captain Grove, who was then an officer in the company in which Joseph was a private, was with Joseph the entire nine months of his service. He also knew Joseph after the war, and sold him two lots of real estate, and said that in so far as he was able to observe, Joseph was sane; that he was a good soldier; that he appeared to know what he was doing with reference to the real estate transactions.
S. Cameron Hinkle, a reputable lawyer of the Atlantic county bar and now assistant prosecutor, knew Joseph very well and saw him very frequently; he said that he knew him in 1890 and from then on; that he was alert, prompt, discussed books, was clean and enjoyed sports. *Page 378 
Dr. Chew, a physician practicing in Atlantic City since 1891, knew Joseph as a patient and always thought him sane; he said that he did not observe any mental "twists" on any of his examinations.
Horace Turner, a cousin, and interested in the outcome of the suit, knew Joseph from his fifth or sixth year and said that Joseph worked with him when Joseph was twenty years old, trimming arc lights, working around wires carrying two thousand five hundred volts; that he ate meals at Joseph's home and never knew of any mental deficiency nor observed anything that excited his suspicions.
Wilson Adams knew Joseph from infancy and played with him, went to school with him and found him bright, jolly and happy, playing the usual games and remaining at school after the witness had left school and gone to work.
James Reeves lived across the street from Joseph and was in the same class at school; said that Joseph played the usual games in the same manner as the other boys and that he never heard or saw anything to excite his suspicions, until after the incidents leading up to the lunacy commission.
An inspection of the commitment of Joseph to the State Hospital, dated January 30th, 1901, contains the certificate of insanity of two physicians, both now deceased, who certified as follows:
Dr. Reed: "Q. Was the attack gradual or rapid in its onset? A. Severe and rapid."
Dr. Souder, in answering the same question, said "rapid." Dr. Chew, in his testimony given in 1910 in docket 28-645, on page 48 of the master's report, said that he had prescribed for Joseph prior to the adjudication of lunacy and that there was no evidence of insanity then.
Mrs. Lacy, a cousin of Joseph, and also interested in the outcome of the suit, visited the home very frequently, in fact, almost daily, and never noticed the things that Mrs. Wilson testified to, and says that Joseph, after leaving the local schools, went to Burlington Academy for about two years before he took a trip around the world; that she went to dancing school with Joseph and she never knew of any insanity. *Page 379 
Joshua Jagmetty, a Spanish War veteran, remembers Joseph in the army and says that he never noticed any peculiarity; that Joseph appeared to be sane, and that he acted as orderly to the governor and colonel.
Silas Wootton was quite intimate with Joseph for a good many years and his testimony is that Joseph had peculiarities but that he never saw anything to indicate insanity.
Mr. Barstow, an interested witness, testified to the same fact.
The lunacy proceedings of April, 1901, were held and Joseph was found to have been a lunatic for a period of three months and upwards preceding that date. Of course, this finding is not binding on this court, but, as was said in Wilkinson v.Sherman, supra (at p. 421):
"That inquisition is entitled to the greatest consideration, for it was taken in Trenton, where he had always lived * * *."
Again, notwithstanding what conclusions defendants' witnesses may now reach from a retrospective view of Joseph's life, still, we find that from 1894, on up through the years, until 1901, reputable people dealt with Joseph, associated with him and assisted him in his legal affairs.
Benjamin F. Johnson, through whom defendants claim, the father of Vincent Jerome Johnson and May Wilson, conveyed to him a one-quarter interest in the Galloway township farm on November 11th, 1893, and Judge Joseph Thompson, the dean of the bar of Atlantic county, took his acknowledgment thereto.
On August 1st, 1896, Joseph purchased premises on Burkard Terrace for $1,900 and this deed was acknowledged before Charles C. Babcock, a reputable member of the bar.
In October of 1894 he purchased land in Pleasantville and Judge Cole took the acknowledgment.
In October of 1899 he purchased lots on Baltic avenue in Atlantic City for $200 and Judge George A. Vroom took the acknowledgment.
In November, 1899, he purchased the Leeds avenue property for $1,800 and that deed was acknowledged by Mr. Babcock. *Page 380 
In May of 1894 he purchased for $1,000 premises in Atlantic City from Congressman Gardner, and that deed was acknowledged by August Stephany, a member of the New Jersey bar.
In April, 1895, he purchased meadow land in Egg Harbor township and Judge Clifton C. Shinn took the acknowledgment.
In December of 1894 he sold the land which he had purchased from Congressman Gardner and the acknowledgment was taken before Harry Wootton, now deceased, and then a reputable member of the bar.
On July 2d 1900, he sold his mother properties and the deed was acknowledged before Judge Enoch A. Higbee, now deceased.
Taking the whole range of the testimony and having before me a mental picture of the witnesses as they testified, both for and against insanity; having in mind Joseph's ability to work as an arc lamp trimmer; having before me the numerous real estate transactions in which he participated; having in view the calibre of men before whom he acknowledged the various conveyances; having in view the character of the men with whom he transacted these real estate dealings; having in view the rather successful real estate deals consummated by him; taking into consideration the fact that the witnesses testifying that Joseph was insane may well have been reconstructing in their minds events of the past and magnifying these events by the subsequent events in Joseph's life, and having in mind the testimony of those witnesses who went to school with Joseph, played with him, associated with him and who were his intimates, and having in mind his army career and record; having in mind the certificates of the two doctors on the commitment and the finding of the lunacy commission, it seems to me that the conclusion is inescapable that Joseph was not mentally incapacitated in 1894 when he made the disputed deed to his mother, nor is there any evidence before me which would justify my finding that he was mentally incapacitated prior to the date set forth in the return of the inquisition *Page 381 
of the lunacy commission, so that the deeds of February 24th, 1894, and of July 25th, 1900, to his mother were made at a time when Joseph was mentally capable of executing them.
Finding as I do that Joseph was mentally capable and that he was competent to transact his business and execute deeds of conveyance, what of the defense of undue influence? How may it be argued that the mother was the dominant influence if her son, of full age, was of sound mind and capable of executing deeds of conveyance?
I am well aware of the long list of decisions of our courts which hold that when a confidential relationship having been established between a donor and donee, there appears to be some undue advantage held by the donee by reason of the donor's mental capacity, the burden of proof, after the showing of these elements, shifts to the donee to show that the donor was not unduly influenced and that he had independent advice on the subject of the making of the deed or conveyance in question, but I do not deem it necessary to analyze these decisions as furnished by counsel for the defendants, nor do I consider the rule of law applicable under my finding of fact, as above indicated.
Finding as I do that Joseph was mentally competent to transact his business and to execute the deeds of conveyance in question, it seems unnecessary to comment upon the evidence submitted by the defendants in an endeavor to establish that Joseph was unduly influenced by his mother and that the deeds in question were the result of her coercion and not the independent act of Joseph. Suffice it to say that there was very little testimony offered in this connection other than that of Mrs. Wilson, whose testimony is rendered less effective by the fact that the incidents she testified to happened when she was only nine years of age, and that of Heck as to Mrs. Johnson's maternal solicitude for Joseph in his business transactions. Outside of Mrs. Wilson's testimony, there was admitted in evidence declarations alleged to have been made by Mrs. Johnson to Mr. Heck, to Mr. Sooy and to Elwood Johnson. To Heck she is alleged to have *Page 382 
said that she would have Joseph's property conveyed to herself and return it to him. As I view this testimony, it dealt with a statement which Mrs. Johnson is alleged to have made at or about the time that she became displeased with Joseph by reason of the purchase of an expensive delivery wagon for the partnership business. If this is so, the alleged conversation occurred at a time after the deed had been delivered, and Mr. Heck's attempted repetition of the statement of Mrs. Johnson is evidently incorrect because, having already obtained the deed, she would not have said she intended to procure it, but if I am mistaken in this, still, it was merely a statement of an intention on the part of Mrs. Johnson and not a statement of an existing fact.
Sooy testified that about two years before his marriage in 1896, he heard Mrs. Johnson say to Joseph's half brother, Benjamin, that she had procured a conveyance of Joseph's property and that she would will it to Joseph when she died. This was in response to a suggestion on the part of Benjamin that he was worried about Joseph's property. This conversation, if it occurred, happened forty years ago and is not corroborated by any other witness. It is indefinite as to date, so that one cannot tell whether the conveyance of February, 1894, had been actually executed and delivered or not. A repetition of a conversation heard so many years ago is of doubtful value in determining the question, even though the witness uses the past tense in attempting to quote Mrs. Johnson.
Mr. Elwood Johnson said that he heard Mrs. Johnson say that she was worried about Joseph and that she would have to take all of his property away, that he wanted to give it away. He says that this conversation took place between 1891 and 1893. If so, it was merely the expression of an intention, as above outlined, and not of an existing fact.
This evidence will be considered from two standpoints.
In the first place, even assuming the evidence of these three witnesses to be admissible as a declaration against interest and therefore an exception to the hearsay rule, is it sufficiently clear and definite as to result in a decree that the *Page 383 
deed of February, 1894, was not an absolute conveyance but one in trust?
The burden of proving the trust rests on the defendants and "the evidence upon which a court may go to establish a resulting trust must not only satisfy the burden of proof, but it must be clear and convincing." Berla v. Strauss, 74 N.J. Eq. 678.
"Nothing short of certain, definite, reliable and convincing proof will justify the court," upon the theory of a resulting trust, in divesting the Turner line of the property and putting it in the defendants. Vigne v. Vigne, 98 N.J. Eq. 274.
Again, the testimony deals with the early statements of deceased persons, and in McKinney's Adm'r v. Slack, 19 N.J. Eq. 164,
the court said:
"Admissions in casual conversations, to persons having no interest in the matter, are the lightest and most unreliable of all kinds of evidence, especially when the party whose admissions are offered is dead, and cannot recall to the witness the circumstances under which they were made."
In Jones v. Knauss, 31 N.J. Eq. 609 (at p. 616), the court said, with respect to admissions alleged to have been made by the complainant:
"Evidence of this kind must always be received with great caution, and should invariably be subjected to the most rigid scrutiny. Even when it proceeds from the mouth of an honest and disinterested witness, it is liable to much imperfection and error. Sometimes a word misunderstood, or a look or action misrepresented, will produce upon the mind of the hearer an impression so entirely different from that which the speaker intended to convey, that if the statement or admission subsequently becomes the subject of investigation, each party, in consequence of the misunderstanding, will be forced to distrust the integrity of the other."
We have, then, an attempt to impress a trust by the testimony of these three witnesses, supported by Mrs. Wilson, who attempt to repeat conversations of years ago and who, after all this lapse of time, endeavor to fix the time of those alleged conversations, two of whom, by the use of the future *Page 384 
tense in quoting Mrs. Johnson's language, by inference, fix the time as before the actual conveyance, and one of whom, by the use of the past tense in relating the conversation, also by inference, put the conversation as after the conveyance.
The testimony and the manner in which it was given does not impress me as being sufficiently certain, definite or reliable and does not, therefore, convince. Heck was quite uncertain as to time, as more fully appears by his cross-examination. Sooy says it was about two years before his marriage in 1896, and Johnson puts it as between 1891 and 1893.
In addition to the inadequacy of the evidence to establish a trust, the testimony of Heck and Johnson was inadmissible.
It is argued that it was so admissible as a declaration against interest and binding on those who claim under Mrs. Johnson.
The rule as laid down by the authorities is against the admissibility of the evidence.
In 22 C.J. 234 ¶ 213, the rule is stated:
"The declarant must have possessed an actual interest, real or apparent, at the time when his declaration was made,"
citing numerous authorities.
In the same work, on page 234, paragraph 218:
"In order for a declaration to be admissible as a declaration against interest, it must clearly appear that the statement of the declarant was actually against his interest at the time when it was made, otherwise the statement will not be admitted."
Again, in the same valume, page 345, paragraph 399:
"A statement in disparagement of title is admissible if made while the declarant was seized of the particular interest to which the statement relates, but not if made before he was possessed of, or after he had parted with, such interest."
Again, in the same volume, page 356, paragraph 411: *Page 385 
"In order to render an admission of a former owner of property competent against his successor in title, it must have been made at a time when the title was in the declarant, for if it was made either before the declarant acquired title or after it had passed out of him it cannot be received, unless the successor in title has concurred or acquiesced therein."
Professor Wigmore, in his work in 3 Ev. (2d ed.) 193 §1459 subdiv. 2, says:
"Under the principle of Admissions, the statements of aparty-opponent, or his predecessor in title, acknowledging an inferior or different title, may be used. Here the main requirements are that the admitter must have had title at the time."
In Miller v. Feenane, 50 N.J. Law 32 (at p. 33), the court held:
"Whether the possession is adverse or is in recognition of and submission to the title of the true owner, may be legally shown by the declarations of the possessor during his possession, according to either of two well-settled rules of law. One is that when the acts of persons are evidence, their contemporaneous declarations, giving character to those acts, are also evidence as part of the res gestae. Luse v. Jones, 10 Vr. 707. The other is that the declarations of a person in possession ofland which tend to limit his title, are competent evidence against those claiming under him."
The result reached on this phase of a consideration of the testimony of the four witnesses is that the testimony of Heck and Johnson is not admissible and that even if the testimony of Sooy is admissible, it is not sufficient under the cases herein recited to establish a trust under the deed of February, 1894, or under the deed of July, 1900.
What about fraud?
It is true that the consideration of the deed of February, 1894, is expressed as one dollar, but this, in itself, is not sufficient to establish that the deed should be declared void.Wintermute v. Snyder, 3 N.J. Eq. 489. A consideration of love and affection is a valid one. Lewis v. Hunt, 1 N.J. Mis. R.211; 120 Atl. Rep. 650; Cockrell v. McKenna, 103 N.J. Law 166,169. *Page 386 
Of course, inadequacy, coupled with a confidential relationship, or circumstances rendering the parties unequal with relation to the conveyance, are sufficient to cause the court to set aside the conveyance on the ground of fraud.
In Wintermute v. Snyder, supra, the court (at p. 496) said:
"Still there may be such unconscionableness, such palpable and excessive inequality in a bargain, as to induce equitable interference. But in all such cases the court goes on the ground of fraud, being satisfied that gross imposition or undue influence must have been practiced. If the inadequacy be such as to shock the conscience, it will amount to evidence of fraud, and will be so considered. Coles v. Trecothick, 9 Ves. 246; Copis
v. Middleton, 2 Mad. R. 409; Peacock v. Evans, 16 Ves. 512;Osgood v. Franklin, 2 Johns. Ch. 1; 1 Story Eq. Ca. 251, and the cases there cited. So, too, when there are other ingredients in the case of a suspicious nature, or peculiar relations between the parties, gross inadequacy of price must necessarily furnish the most vehement presumption of fraud."
But in the instant case I find Joseph mentally sound and a relation of love existing between mother and son and no fiduciary relation existing between them, so that there is nothing in the transactions as represented by the attacked conveyance to raise a presumption of fraud or imposition and, therefore, he had a right to make this conveyance, moved by whatever sane impulse, thought or desire which he then had.
So in Gifford, Adm., v. Thorn, 9 N.J. Eq. 702, "the parties did not stand on an equal footing," but in the instant case they did. Joseph had traveled around the world at the age of fifteen. He had the benefit of an education in the schools of Atlantic City and Burlington county. He had deeds prepared by attorneys of high standing. He gave no indication to them of any necessity for advice and to them appeared to know what he was doing.
Other cases cited by the defendants are based on inadequacy of the consideration, coupled with fraud disclosed as a *Page 387 
result of the peculiar circumstances of each case, such as lack of mentality, age, feeble physical condition, dependence and lack of business experience.
The only element in the instant case that could be seized upon as a sufficient ground for canceling the conveyance of February, 1894, would be the nominal consideration, with an entire absence of any other circumstances indicating fraud or from which fraud might be presumed.
Mr. Justice Garrison, in Phillips v. Pullen, 45 N.J. Eq. 830
(at p. 836), laid down the following rule, which has been frequently reiterated in the decisions of our court of errors and appeals:
"Fraud will be presumed from inadequacy of consideration, standing alone, if the inadequacy be so gross as to satisfy the court that it could have been brought about only by deceit or imposition, provided the circumstances and relations of theparties either lend themselves to such a presumption, or arewithout probative force sufficient to neutralize it."
The circumstances and relation of the parties in the case before me do not lend themselves to the presumption indicated as necessary in the above quoted case.
While the principal attack has been on the conveyance of February, 1894, and most of the references in this conclusion have been to the deed, all that has been said with reference to that deed is equally applicable to that of 1900. The evidence fails to disclose lack of mentality in the first instance, as well as in the latter conveyance, and in the latter conveyance there was a consideration of $2,000 paid.
Right here, it is important to again note that Joseph was not incarcerated in the insane asylum until January 30th, 1901, and an inspection of the certificate of Dr. Reed and Dr. Souder, two very reputable physicians of Atlantic City, now deceased, shows that in their opinion the insanity of Joseph did not come on gradually but was "rapid," and there is nothing to show any unusual action of Joseph at or about July of 1900. It was not until about the time of the commitment that the evidence of insanity appeared. *Page 388 
My finding, therefore, is that the deeds of February, 1894, and July, 1900, are not and were not invalid by reason of the mental incapacity of the grantor or by reason of undue influence on the part of the grantee, but that they were valid and effectual conveyances of the lands therein described.
The next point urged by the defendants is that "the making of the mortgage by Joseph R. Johnson upon the Ohio avenue property, after he inherited it from his mother, destroy all the rights of the complainants to the same."
This mortgage, it will be remembered, was given by Joseph as part payment of the conveyance to him by his half brother, Benjamin, of Benjamin's interest in the Ohio avenue property, and that the mortgage included within its description not only the interest conveyed by Benjamin to Joseph but also that portion thereof which Joseph had received by virtue of a devise from his mother.
Defendants say that, "assuming that Joseph inherited this Ohio avenue property from his mother, he, by his mortgage upon the property, given to his half brother, made a conveyance of the property [the mortgage] which destroyed all rights of those in the blood of the mother to it."
The mortgage contained a provision that if taxes remained in default for sixty days that the "principal aforesaid shall become due and payable immediately and payment of such principal or debt * * * may be recovered at once."
It was stipulated that Joseph paid the entire principal debt without any action having been taken by the mortgagee by reason of any default in the terms of the mortgage and, notwithstanding that fact, defendants insist that the execution by Joseph of this mortgage broke the line of descent so that the blood of the father and not that of the mother inherited.
The argument is based on what our courts have said with regard to the legal status of a mortgage, the first cited case beingShields v. Lozear, 34 N.J. Law 496, wherein the court said:
"By the common law, a mortgage in fee created an immediate estate in fee-simple in the mortgagee, subject to be *Page 389 
defeated by the payment of the mortgage money on the day named in the condition, and the mortgagee might enter immediately on the mortgaged premises, and hold the estate until the condition was performed. In this state, it was held by this court that the right to enter was postponed, and the possession was in the mortgagor, until the condition was broken by default in the payment of the mortgage money. Sanderson v. Den, ex dem.Price, 1 Zab. 646, note. With this modification of the rights ofthe mortgagee, as to the postponement of ability to obtain thepossession of the mortgaged premises, the nature of the mortgageas a conveyance remains as it was at common law."
Many other cases are cited to like effect, but we are dealing with a mortgage which has been fully paid, and any default which may have created a right in the mortgagee to take possession or to foreclose or to bring ejectment not availed of or attempted by the mortgagee and, while the court speaks of the mortgage as a conveyance, there is a complete lack of authority that the conveyance therein spoken of is of such a nature as to break the line of descent because, while spoken of as a conveyance in fee, its character as such was defeated by payment and satisfaction and, when paid and satisfied, no reconveyance is required to put the fee in the mortgagor, for a satisfaction of the mortgage is sufficient.
In this connection, the court, in Blue v. Everett, 56 N.J. Eq. 455
(at p. 458), said:
"In the contemplation of courts of equity, the mortgage is a mere incident of the debt, and can be used by the mortgagee only as a means for obtaining satisfaction thereof."
In Stewart v. Fairchild-Baldwin Co., 91 N.J. Eq. 86, the court said:
"The common law rule, that a mortgage created an immediate estate in the mortgagee, and vested in him immediately, upon the execution and delivery of the mortgage, an actual estate with a right of immediate possession, subject only to be defeated by the payment of the mortgage money, has not been adopted by our courts."
In Grennon v. Kramer, 111 N.J. Eq. 337, the court said: *Page 390 
"The mortgage is regarded primarily as a security; the debt is the principal fact, and the mortgage is collateral thereto."
The master's report filed herein fully sets forth the various tracts or parcels of real estate of which Joseph died seized, the sales made by the guardian, the amounts received from such sales, the income from the invested proceeds of sales, and all such information as is necessary for the framing of an order of distribution, and I assume counsel will be able to agree on the form and substance of such a decree. If not, further application may be made to settle a decree of distribution, both as to the real and personal estate.
A further factual question arises as to the values to be placed on the Ohio avenue and the Ohio and Atlantic avenues properties. The Ohio avenue lot sold for $20,000 and the real estate experts for both parties agree that $11,000 of this sum should be placed on the northerly Ohio avenue lot, since that property had two buildings erected thereon, and it will be so decreed, leaving the balance of $9,000 as the value of the southerly Ohio avenue lot.
There is a dispute as to the value of the first twenty-five feet of the Ohio and Atlantic avenues property, one of the experts giving a twenty-five per cent. increase for the first twenty-five feet and the other a twenty per cent. increase thereon. Adopting the higher figure, which I do, the value of the first twenty-five feet would be $38,040 and for the remaining one hundred feet $120,460, which equals $60,230 for each fifty-foot lot on Atlantic avenue, beginning twenty-five feet westerly of the corner of Ohio and Atlantic avenues.
A decree in conformity herewith will be advised. *Page 391